**ORAL ARGUMENT REQUESTED**

No. 23-3094

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

ZODIAC POOL SYSTEMS LLC,
*Petitioner*,

v.

UNITED STATES DEPARTMENT OF ENERGY,
*Respondent*.

---

On Petition for Review of a Final Rule
from the United States Department of Energy

---

**BRIEF OF PETITIONER ZODIAC POOL SYSTEMS LLC**

---

Keith J. Coyle, Esquire
Christina Manfredi McKinley, Esquire
Stefanie Pitcavage Mekilo, Esquire
Babst, Calland, Clements & Zomnir, P.C.
Two Gateway Center
Pittsburgh, PA 15222
(412) 394-5400
kcoyle@babstcalland.com
cmckinley@babstcalland.com
smekilo@babstcalland.com
*Counsel for Petitioner Zodiac Pool
Systems LLC*

Dated: August 7, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Appellate Rule 26.1.1, Petitioner submits the following corporate disclosure statement:

Zodiac is a limited liability company formed in the State of Delaware. The ultimate parent of Zodiac is Fluidra, S.A, a publicly traded company on the Madrid Exchange. Fluidra, S.A. has a financial interest in the outcome of this litigation.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ............................................................................v

GLOSSARY...................................................................................................xi

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION................................................................2

STATUTES AND REGULATIONS ...............................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..............................3

STATEMENT OF RELATED CASES AND PROCEEDINGS ..........................4

STATEMENT OF THE CASE.........................................................................4

    A.   Pool Pump Systems.........................................................................4

    B.   Enactment and Evolution of EPCA .................................................5

    C.   Criteria for Authorized Energy Conservation Standards...........................8

    D.   Relevant Rulemaking Proceedings ..................................................9

        1.   Pool Pumps.............................................................................10

            a.   The DPPP Working Group............................................10

            b.   2017 Pool Pump Rule....................................................11

        2.   Pool Pump Motors...................................................................12

            a.   August 2017 DOE Public Meeting...............................12

            b.   August 2018 Joint Stakeholder Petition to DOE..........13

            c.   February 2019 Alternative Industry Proposal to DOE................15

            d.   April 2020 CEC Energy Efficiency Regulations .........15

            e.   October 2020 DOE Proposed Test Procedure and Labeling
               Requirements ..................................................................16

            f.   July 2021 DOE Final Test Procedure Requirements ..................17

            g.   June 2022 DOE Proposed Energy Conservation Standards........18

            h.   July 2022 DOE Public Meeting.....................................19

            i.   August 2022 Industry Stakeholder Comments to DOE .............20

            j.   September 2023 Pool Pump Motor Rule.......................21

SUMMARY OF ARGUMENT ........................................................................22

ARGUMENT ..................................................................................................22

I.    Venue is proper because Zodiac, a limited liability company formed in the State of Delaware, "resides" in the Third Circuit for purposes of 42 U.S.C. §6306(b)(1). ......................................................................22

    A.   Standard of Review ....................................................................22

    B.   Argument....................................................................................23

II.   EPCA does not authorize DOE to prescribe energy conservation standards for DPPP motors. ....................................................................27

    A.   Standard of Review ....................................................................27

    B.   Argument....................................................................................28

        1.   Section 6313(b) does not authorize DOE to prescribe energy conservation standards for DPPP motors. .......................29

        2.   No other provision in EPCA authorizes DOE to prescribe energy conservation standards for DPPP motors. ........................31

        3.   Section 6316 does not authorize DOE to exercise rulemaking authority that does not otherwise exist.....................32

        4.   DOE knows it lacks the authority under EPCA to prescribe energy conservation standards for DPPP motors. .......................36

III.  Even if EPCA authorizes DOE to prescribe energy conservation standards for DPPP motors, the requirements for PCBP motors are arbitrary and capricious..........................................................................38

    A.   Standard of Review ....................................................................38

    B.   Argument....................................................................................38

        1.   DOE failed to reasonably explain its refusal to establish a separate equipment class for PCBP motors................................38

        2.   DOE acted arbitrarily and capriciously in mandating variable-speed-control technology for PCBP motors..................42

            a.   DOE failed to properly consider applicable statutory criteria in mandating the variable-speed-control design requirement for PCBPs..............................................44

               i.   DOE failed to adequately consider all salient statutory criteria. .......................................................44

ii.   DOE erred in refusing to establish a separate group for PCBP motors within the DPPP motors equipment class under Section 6295(q). .......................47

b.   The variable-speed-control design requirement for PCBP motors is not necessary under Section 6295(r). .........48

c.   DOE failed to consider the relationship between the Pool Pump Motor Rule and the companion Pool Pump Rule. ........................................................................................49

d.   DOE acted arbitrarily and capriciously in applying UL 1004-10's four-speed operation requirement to PCBPs.   ...............................................................................51

IV.   The Pool Pump Motor Rule must be vacated. ............................................53

CONCLUSION ....................................................................................................56

CERTIFICATE OF COMPLIANCE ....................................................................57

CERTIFICATE OF SERVICE ..............................................................................58

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abington Mem. Hosp. v. Heckler*, 750 F.2d 242 (3d Cir. 1984)...............................53

*ACLU v. FCC*, 774 F.2d 24 (1st Cir. 1985) ................................................25

*Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018)...............................35

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146
(D.C. Cir. 1993) ......................................................................54

*American Cyanamid Co. v. Hammond Lead Prods., Inc.*, 495 F.2d 1183
(3d Cir. 1974) ........................................................................24

*American Energy Corp. v. Rockies Express Pipeline, Inc.*, 622 F.3d 602
(6th Cir. 2010) .......................................................................25

*American Petroleum Inst. v. EPA*, 52 F.3d 1113 (D.C. Cir. 1995) .........................35

*American Petroleum Inst. v. EPA*, 706 F.3d 474 (D.C. Cir. 2013) .........................35

*Arizona v. EPA*, 77 F.4th 1126 (D.C. Cir. 2023) .........................................2

*City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276 (3d Cir. 2019)................28

*Comite' de Apoyo a los Trabajadores Agricolas v. Perez*, 774 F.3d 173
(3d Cir. 2014)............................................................... 41, 45, 54

*Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021) .........................................2

*CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076 (D.C. Cir. 2009) ...........29

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1 (D.C. Cir.
2015) ................................................................................45

*Denver & Rio Grande W. R.R. Co. v. Bhd. of R.R. Trainmen*, 387 U.S. 556
(1967) ...............................................................................24

*Dewey v. Volkswagen A.G.*, 681 F.3d 170 (3d Cir. 2012) .................................22

*Environmental Integrity Project v. E.P.A.*, 425 F.3d 992 (D.C. Cir. 2005) ...........29

*Exxon Mobil Corp. Allapattah Servs., Inc.*, 545 U.S. 546 (2005) .........................34

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .............................38

*Federal Power Comm'n v. Moss*, 424 U.S. 494 (1976) .....................................28

*Federal Power Commission v. Texaco, Inc.*, 377 U.S. 33 (1964) ................... 24, 25

*Kannikal v. Att'y Gen. U.S.*, 776 F.3d 146 (3d Cir. 2015)...............................35

*Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653 (3d Cir. 2014) ..................................................................................................28

*Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461 (5th Cir. 2024) ............... 31, 37, 52

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..........................................................41

*Merchants Fast Motor Lines, Inc. v. Interstate Commerce Comm'n*, 5 F.3d 911 (5th Cir. 1993) ..........................................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..........................................................................................38

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ..............................................................................................................41

*Nehemiah v. Athletics Cong. of U.S.A.*, 765 F.2d 42 (3d Cir. 1985) .......................24

*NRDC v. U.S. Dep't of Energy*, No. 17 Civ. 6989, 2018 WL 1229733 (S.D.N.Y. Mar. 6, 2018) ..................................................................................26

*NRDC v. U.S. EPA*, 859 F.2d 156 (D.C. Cir. 1988) ................................................50

*Phila. Newspapers*, 599 F.3d 298 (3d Cir. 2010) ...................................................28

*Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663 (1953)........................................27

*Portland Cement Ass'n v. EPA*, 665 F.3d 177 (D.C. Cir. 2011) ...................... 50, 51

*Prater v. Dep't of Corr.*, 76 F.4th 184 (3d Cir. 2023) .............................................22

*Prometheus Radio Project v. FCC*, 824 F.3d 33 (3d Cir. 2016) ............................54

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ..........35

*Reese Bros., Inc. v. United States*, 447 F.3d 229 (3d Cir. 2006) ............................53

*Sea Island Comprehensive Healthcare Corp. v. U.S. Dep't of Health & Human Servs.*, No. 02-1095, 2002 WL 31045954 (D.C. Cir. 2002).................25

*Shaw v. Quincy Mining Co.*, 145 U.S. 444 (1892) .......................................... 24, 25

*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996)...............................38

*Suttle v. Reich Bros. Constr. Co.*, 333 U.S. 163 (1948) ..........................................24

*TC Heartland LLC v. Kraft Foods Group Brands, LLC*, 581 U.S. 258 (2017).......27

*United Refining Co. v. EPA*, 64 F.4th 448 (3d Cir. 2023) .......................................38

*Western Union Tel. Co. v. FCC*, 541 F.2d 346 (3d Cir. 1976)................................28

*Wilkinson v. Abrams*, 627 F.2d 650 (3d Cir. 1980) ................................................28

**Statutes**

12 U.S.C. §1467 .................................................................................27

15 U.S.C. §1193 .................................................................................26

15 U.S.C. §1262 .................................................................................26

15 U.S.C. §1474 .................................................................................26

15 U.S.C. §1710 .................................................................................26

15 U.S.C. §2060 .................................................................................26

15 U.S.C. §2615 .................................................................................26

15 U.S.C. §2618 .................................................................................26

15 U.S.C. §57a ..................................................................................26

15 U.S.C. §717 ..................................................................................25

15 U.S.C. §77 ...................................................................................26

15 U.S.C. §78 ...................................................................................26

15 U.S.C. §80 ...................................................................................26

18 U.S.C. §843 ..................................................................................26

20 U.S.C. §6083 .................................................................................26

20 U.S.C. §7973 .................................................................................26

21 U.S.C. §333 ..................................................................................26

21 U.S.C. §346 ..................................................................................26

21 U.S.C. §348 ..................................................................................26

21 U.S.C. §355 ..................................................................................26

21 U.S.C. §360 ..................................................................................26

21 U.S.C. §371 ..................................................................................26

21 U.S.C. §387 ..................................................................................26

22 U.S.C. §6761 .................................................................................26

27 U.S.C. §204 ..................................................................................26

28 U.S.C. §1391 ....................................................................... 25, 26, 27

28 U.S.C. §2343 .......................................................................... 25, 26

29 U.S.C. §210 ..................................................................................26

29 U.S.C. §655 ..................................................................................26

30 U.S.C. §811 ...........................................................................................................26

33 U.S.C. §1319 .........................................................................................................26

33 U.S.C. §1321 .........................................................................................................26

33 U.S.C. §1369 .........................................................................................................26

33 U.S.C. §907 ...........................................................................................................26

42 U.S.C. §10139 .......................................................................................................26

42 U.S.C. §2022 .........................................................................................................26

42 U.S.C. §300 ...........................................................................................................26

42 U.S.C. §5405 .........................................................................................................26

42 U.S.C. §6201 .............................................................................................................1

42 U.S.C. §6202 .........................................................................................................23

42 U.S.C. §6292 .........................................................................................................34

42 U.S.C. §6295 .............................................................................................. *passim*

42 U.S.C. §6303 .........................................................................................................23

42 U.S.C. §6306 .............................................................................................. *passim*

42 U.S.C. §6311 .............................................................................................. *passim*

42 U.S.C. §6312 ...................................................................................... 30, 31, 35

42 U.S.C. §6313 .............................................................................................. *passim*

42 U.S.C. §6316 .............................................................................................. *passim*

42 U.S.C. §6317 ...................................................................................... 29, 37

42 U.S.C. §6976 .........................................................................................................26

42 U.S.C. §7525 .........................................................................................................26

42 U.S.C. §8412 .........................................................................................................26

42 U.S.C. §9609 .........................................................................................................26

43 U.S.C. §1656 .........................................................................................................26

45 U.S.C. §355 ...........................................................................................................26

49 U.S.C. §1153 .........................................................................................................26

49 U.S.C. §30161 .......................................................................................................26

49 U.S.C. §31141 .......................................................................................................26

49 U.S.C. §32503 .......................................................................................................26

49 U.S.C. §32909 ..................................................................................26

49 U.S.C. §32915 ..................................................................................26

49 U.S.C. §46110 ..................................................................................26

49 U.S.C. §5127 ....................................................................................26

5 U.S.C. §706 .................................................................................. 27, 53

5 U.S.C. §7123 ......................................................................................26

7 U.S.C. §10 ..........................................................................................27

7 U.S.C. §12 ..........................................................................................26

7 U.S.C. §1600 ......................................................................................26

7 U.S.C. §194 ........................................................................................27

7 U.S.C. §2 ............................................................................................26

7 U.S.C. §228 ........................................................................................27

7 U.S.C. §8 ............................................................................................27

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121
   Stat. 1492 ..........................................................................................8

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 ..........................7

Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat.
   871 ..............................................................................................5, 6

National Energy Conservation Policy Act, Pub. L. No. 95-619, 92 Stat. 3206
   (1978) ...........................................................................................6, 7

## Other Authorities

*Appliance Standards and Rulemaking Federal Advisory Committee: Notice
   of Intent To Establish the Dedicated Purpose Pool Pumps Working
   Group To Negotiate a Notice of Proposed Rulemaking (NOPR) for
   Energy Conservation Standards*, 80 Fed. Reg. 51,483 (Aug. 25, 2015) ............10

ARGONNE NATIONAL LABORATORY, CLASSIFICATION AND EVALUATION OF
   ELECTRIC MOTORS AND PUMPS 1-1 to 1-2 (1980) ........................................7, 50

*Energy Conservation Program: Energy Conservation Standards for
   Dedicated Purpose Pool Pump Motors*, 88 Fed. Reg. 66,966 (Sept. 28,
   2023) ................................................................................. *passim*

*Energy Conservation Program: Energy Conservation Standards for
   Dedicated-Purpose Pool Pump Motors*, 87 Fed. Reg. 37,122 (June 21,
   2022) ..................................................................... 18, 19, 29, 36

*Energy Conservation Program: Energy Conservation Standards for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 24,218 (May 26, 2017) ..... 12, 13

*Energy Conservation Program: Energy Conservation Standards for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 5,650 (Jan. 18, 2017) ....... *passim*

*Energy Conservation Program: Test Procedure and Labeling Requirements for Dedicated-Purpose Pool Pump Motors*, 85 Fed. Reg. 62,816 (Oct. 5, 2020) ........................................................................................ 16, 17, 37

*Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pump Motors*, 86 Fed. Reg. 40,765 (July 29, 2021) ............................ 17, 18, 37

*Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 36,858 (Aug. 7, 2017) ........................................ 4, 5, 41, 49

# **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| ASRAC | Appliance Standards and Rulemaking Federal Advisory Committee |
| DOE | United States Department of Energy |
| DPPP | Dedicated Purpose Pool Pump |
| DPPP Motor | Dedicated Purpose Pool Pump Motor |
| EPCA | Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871, as amended through the Energy Efficiency Improvement Act of 2015, Pub. L. No. 114-11, 129 Stat. 182 |
| NEMA | National Electrical Manufacturers Association |
| Petitioner | Zodiac Pool Systems LLC |
| PCBP | Pressure Cleaner Booster Pump |
| PCBP Motor | Pressure Cleaner Booster Pump Motor |
| PHTA | Pool and Hot Tub Alliance |
| Pool Pump Rule | *Energy Conservation Program: Energy Conservation Standards for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 5,650 (Jan. 18, 2017) |
| Pool Pump Motor Rule | *Energy Conservation Program: Energy Conservation Standards for Dedicated Purpose Pool Pump Motors*, 88 Fed. Reg. 66,966 (Sept. 28, 2023) |
| Respondent | Department of Energy or DOE |
| WEF | Weighted Energy Factor |

DPPP Working Group       Dedicated Purpose Pool Pump Working Group

Zodiac                   Zodiac Pool Systems LLC

## INTRODUCTION

This case illustrates what happens when a federal agency promulgates a rule that it knows is unlawful. The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§6201 *et seq.*, establishes statutory energy conservation standards for certain types of covered consumer products and industrial equipment. Congress has also authorized the U.S. Department of Energy ("DOE") to prescribe energy conservation standards by rule for certain other types of covered products and industrial equipment, to include electric motors. Definite purpose motors, however, including the dedicated purpose pool pump ("DPPP") motors at issue in this case, are exempt from EPCA's statutory standards, and Congress has not otherwise authorized DOE to set such standards by rule.

DOE agrees that DPPP motors are exempt from EPCA's statutory energy conservation standards for electric motors, having reversed itself into that position in the final rule under review. *Energy Conservation Program: Energy Conservation Standards for Dedicated Purpose Pool Pump Motors*, 88 Fed. Reg. 66,966, 66,971–66,972 (Sept. 28, 2023) ("Pool Pump Motor Rule"). DOE nevertheless claims—citing no statutory support—that EPCA authorizes the issuance of such standards by regulation. But simply saying something exists does not make it so, and DOE cannot rewrite EPCA along the way, hoping that patchwork reasoning and broad propositions will prevent anyone from becoming the wiser.

And even if DOE could somehow manage to fit a regulatory square peg into a statutory round hole, the Pool Pump Motor Rule is arbitrary and capricious in any event, particularly the design requirements for pressure cleaner booster pump ("PCBP") motors. DOE mandated use of variable-speed-control technology in these statutorily exempt motors, even though manufacturers specifically design PCBPs for single-speed operation. In doing so, DOE misapplied relevant standards, contradicted itself, ignored important aspects of the problem, and failed to respond to serious objections. All of this led to an outcome only the government could love: a mandate requiring manufacturers to redesign a perfectly good product so that consumers can pay for a technology they will never actually use.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. §6306(b)(1). DOE invoked a referenced statutory provision, 42 U.S.C. §6295, in prescribing the Pool Pump Motor Rule, *see* 42 U.S.C. §6306(b)(1), §6316(a)(1); 88 Fed. Reg. at 66,971, and Zodiac filed its Petition for Review of that Rule within the 60-day statutory period. As a manufacturer of DPPPs and DPPP motors, Zodiac is directly regulated by the Pool Pump Motor Rule, (*see* JA000366); 88 Fed. Reg. at 67,027, and thus has standing under Section 6306(b)(1). *See Arizona v. EPA*, 77 F.4th 1126, 1131 (D.C. Cir. 2023); *Corbett v. TSA*, 19 F.4th 478, 483 (D.C. Cir. 2021).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in an Addendum to this brief.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.     Whether venue is proper because Zodiac, a limited liability company formed in the State of Delaware, is a "person" who "resides" in the Third Circuit under 42 U.S.C. §6306(b)(1).

| | |
|---|---|
| Raised: | Not applicable |
| Objected to: | Not applicable |
| Ruled upon: | Not applicable |

II.    Whether DOE lacks statutory authority under EPCA to prescribe energy conservation standards for DPPP motors.

| | |
|---|---|
| Raised: | JA000011–000012 (88 Fed. Reg. at 66,971–66,972) |
| Objected to: | Not applicable |
| Ruled upon: | Not applicable |

III.    Whether DOE failed to comply with EPCA and the Administrative Procedure Act ("APA") in prescribing the Pool Pump Motor Rule, particularly the variable-speed-control design requirement for PCBP motors.

| | |
|---|---|
| Raised: | JA001733 (87 Fed. Reg. 37,122) |
| Objected to: | *Passim, e.g.*, JA000375–000376, JA000384–000387, JA000394–000395, JA000396–000399, JA000401–000403, JA000408– |

-3-

000410,   JA000414–000419,   JA000423–000429;   JA000432–000440;   JA000442–000443, JA000444–JA000454.

Ruled upon:        JA00006 (88 Fed. Reg. 66,966)

IV.    Whether DOE's failure to comply with EPCA and the APA warrants vacatur of the Pool Pump Motor Rule.

Raised:            Not applicable

Objected to:       Not applicable

Ruled upon:        Not applicable

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously, and there is no other previous or pending appeal before this Court arising out of the Pool Pump Motor Rule.

## STATEMENT OF THE CASE

### A.    Pool Pump Systems

Millions of American consumers use pool pumps, or DPPPs, to operate and maintain their pools. *Energy Conservation Program: Energy Conservation Standards for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 5,650, 5,650–5,743 (Jan. 18, 2017) ("Pool Pump Rule"); *Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 36,858, 36,858–36,931 (Aug. 7, 2017).  One type of DPPP is known as a pressure cleaner booster pump, or PCBP.

82 Fed. Reg. at 5,669–5,670.  PCBPs provide the pressure necessary to propel cleaning devices along the bottom of a pool to remove debris and other unwanted materials.  *Id.*  Manufacturers specifically design PCBPs to operate at high head (*i.e.*, pressure) and low flow.  *Id.*; 82 Fed. Reg. at 36,869–36,870, 36,885.  Because of these unique characteristics, manufacturers use single-speed electric motors in PCBPs, 82 Fed. Reg. at 5,678, 5,739, a design decision that is both cost-effective and energy efficient for PCBP systems.

Pool filter pumps are another type of DPPP.  *Id.* at 5,650–5,743.  These pumps are part of a multi-purpose DPPP system that circulates pool water for cleaning, filtration, heating, treating, and chlorination.  *Id.* at 5,667–5,674.  Unlike PCBPs, pool filter pumps are designed to operate under a variety of different conditions.  *Id.* Because of these functional and operational differences from PCBPs, variable-speed-control motors can improve the cost-effectiveness and energy efficiency of pool filter pump systems.

## B.   Enactment and Evolution of EPCA

Congress enacted EPCA in December 1975 with a goal of increasing domestic energy supplies and reducing energy demand through, among other measures, conservation plans and improved energy efficiency of consumer products.  Pub. L. No. 94-163, §2, 89 Stat. 871, 874.  EPCA addressed this second objective in Part A of Subchapter III ("Part A").  In its nascent form, Part A required DOE to prescribe

"energy efficiency improvement target[s]" for thirteen covered consumer products that Congress determined were high contributors to domestic energy demand.[1]  *Id.* §321(a)(2), §322(a), §325(a)(1)–(2), 89 Stat. at 917, 918, 924.  The Act aspired to achieve those targets through a market-based system of energy efficiency testing procedures and labeling rules, *id.* §§323–324, 89 Stat. at 919–923, but authorized DOE to impose minimum "energy efficiency standards" if those targets were unlikely to be achieved, *id.* §325(a)(4)(C), (a)(5), (b)–(d), 89 Stat. at 924–926.

Congress retooled EPCA three years later via the National Energy Conservation Policy Act ("NECPA"), Pub. L. No. 95-619, 92 Stat. 3206 (1978).  NECPA authorized DOE to prescribe minimum energy efficiency standards for the thirteen previously identified consumer products without first establishing efficiency targets.  §422, 92 Stat. at 3259.  NECPA also added a new part, Part A-1 of Subchapter III ("Part A-1"), for certain industrial equipment, including "[e]lectric motors and pumps."  *Id.* §441(a), 92 Stat. at 3267–3273.  Part A-1 directed DOE to evaluate the practicability of imposing energy efficiency standards on electric motors and pumps and report the results to Congress, together with any appropriate legislative recommendations.  *Id.* at 3269.  It also authorized DOE, after completing

---

[1] The 1975 Act granted this authority to the Federal Energy Administration, the precursor to DOE.  Pub. L. No. 94-163, §3(1).  Use of "DOE" herein embraces both DOE as currently constituted and the Federal Energy Administration.

the evaluation, to develop test procedures and labeling requirements for electric motors and pumps. *Id.* at 3270–3272. DOE completed the study in 1980, recommending that industry implementation of testing and labeling for electric pumps and motors be monitored without imposing minimum efficiency standards. ARGONNE NATIONAL LABORATORY, CLASSIFICATION AND EVALUATION OF ELECTRIC MOTORS AND PUMPS 1-1 to 1-2 (1980), https://www.osti.gov/servlets/purl/6719781 ("1980 DOE Study").

Congress amended EPCA again in the Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776, establishing minimum "energy conservation standards" for certain industrial equipment, including electric motors. §122(d), 106 Stat. at 2814–2815. The Act defined "energy conservation standards" to mean "(A) a performance standard that prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a product; or (B) a design requirement for a product." *Id.* at 2808. The Act also defined "electric motor" to include multiple types of motors, including "definite purpose motors," *id.* §122(a), 106 Stat. at 2807, but expressly exempted the latter from the statutory energy conservation standards, *id.* §122(d), 106 Stat. at 2814. The Act separately authorized DOE to prescribe standards by rule for certain other types of industrial equipment, *id.* §124, 106 Stat. at 2832–2833, but not for definite purpose motors.

Congress updated the existing statutory energy conservation standards for motors and established new standards for other types of motors in the Energy Independence and Security Act of 2007, Pub. L. No. 110-140, §313(b), 121 Stat. 1492, 1568–1569. Congress did not rescind the statutory exemption for definite purpose motors or otherwise authorize DOE to prescribe energy conservation standards for such motors in the 2007 Act nor in any subsequent legislation.

**C.    Criteria for Authorized Energy Conservation Standards**

DOE must satisfy specific statutory criteria when prescribing energy conservation standards. 42 U.S.C. §6295(o), §6316(a). Such standards must be designed to achieve "the maximum improvement in energy efficiency" that is both "technologically feasible and economically justified." *Id.* §6295(o)(2)(A), §6316(a). DOE cannot prescribe any standard that will not achieve these targets. *Id.* §6295(o)(3)(B), §6316(a).

Economic justification is measured by determining whether "the benefits of the standard exceed its burdens." *Id.* §6295(o)(2)(B)(i), §6316(a). In making this determination, DOE must consider the following factors:

> (I) the economic impact of the standard on the manufacturers and on the consumers of the [equipment] subject to such standard;

> (II) the savings in operating costs throughout the estimated average life of the covered [equipment] in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the

covered [equipment] which are likely to result from the imposition of the standard;

(III) the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

(IV) any lessening of the utility or the performance of the covered [equipment] likely to result from the imposition of the standard;

(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

(VI) the need for national energy and water conservation; and

(VII) other factors the Secretary considers relevant.

*Id.* §6295(o)(2)(B)(i)(I)–(VII), §6316(a). If DOE finds that the additional cost to the consumer of purchasing compliant equipment will be less than three times the value of energy savings to that consumer during the first year, a rebuttable presumption of economic justification arises. *Id.* §6295(o)(2)(B)(iii), §6316(a).

### D. Relevant Rulemaking Proceedings

This case involves a series of interrelated DOE rulemaking proceedings for pool pumps and pool pump motors. The proceedings began in 2015 when DOE initiated a negotiated rulemaking to develop energy conservation standards for pool pumps, an effort that led to issuance of a direct final rule in 2017. Almost immediately afterward, DOE initiated another proceeding to consider an issue

raised, but not addressed, in the 2017 direct final rule; namely, whether pool pump *motors* should also be regulated. DOE spent the next six years considering that issue in a variety of contexts before issuing the final rule under review in 2023. Zodiac summarizes relevant aspects of those tandem proceedings below.

### 1.    Pool Pumps

### a.    The DPPP Working Group

In August 2015, DOE announced its intent to establish a working group ("DPPP Working Group") to negotiate proposed energy conservation standards for pool pumps. *Appliance Standards and Rulemaking Federal Advisory Committee: Notice of Intent To Establish the Dedicated Purpose Pool Pumps Working Group To Negotiate a Notice of Proposed Rulemaking (NOPR) for Energy Conservation Standards*, 80 Fed. Reg. 51,483 (Aug. 25, 2015). DOE explained that the DPPP Working Group would consist of interested stakeholders charged with reaching consensus recommendations and that those recommendations would be used in developing any subsequent standards. *Id.* at 51,483–51,486. DOE appointed a Zodiac representative to the DPPP Working Group. (JA000932.)

After a series of public meetings, the DPPP Working Group approved an initial phase of recommendations in December 2015. (JA000926–000931.) The initial recommendations addressed the scope of the negotiated rulemaking,

definitions for key terms, and the test procedure and a new performance metric, the weighted energy factor ("WEF"),[2] for determining energy efficiency of DPPPs. (*Id.*)

Following several additional meetings, the DPPP Working Group approved a second phase of recommendations in June 2016. (JA001727.) The DPPP Working Group recommended that energy conservation standards be applied to four DPPP equipment classes, three for pool filter pumps and one for PCBPs, and that a minimum WEF score be applied to each class. (JA001727–001728, JA001730–001731.) It also recommended that certain definitions be applied to the different speed configurations used in DPPPs, *i.e.*, single-speed, two-speed, multi-speed, and variable speed. (JA001728–001729.) The DPPP Working Group did not recommend that any specific speed configuration be mandated for DPPPs. (JA001727–001731.)

### b. 2017 Pool Pump Rule

In January 2017, DOE published a direct final rule with energy conservation standards for DPPPs. 82 Fed. Reg. 5,650. Consistent with the DPPP Working Group's consensus recommendations, the Pool Pump Rule applied performance-based energy conservation standards to four equipment classes: (1) standard-size

---

[2] Comparable to the miles-per-gallon standard for automobiles, the WEF represents the amount of energy consumed in pumping a certain amount of water over time. 82 Fed. Reg. at 5,660–5,663.

self-priming pool filter pumps with certain hydraulic horsepower characteristics, (2) small-size self-priming pool filter pumps with certain hydraulic horsepower characteristics, (3) non-self-priming pool filter pumps with certain hydraulic horsepower characteristics, and (4) PCBPs. *Id.* at 5,651–5,652. A minimum allowable WEF score applied to each equipment class. *Id.*

The Pool Pump Rule also applied prescriptive standards to three additional equipment classes: (1) integral sand filter pool pumps, (2) integral cartridge filter pool pumps, and (3) all DPPPs distributed in commerce with freeze-protection controls. *Id.* at 5,652. Pool pumps in the first two classes had to include a timer with automatic shutoff after a maximum 10-hour runtime, and pumps in the third class had to be shipped with freeze protection disabled or certain default, user-adjusted settings. *Id.*

DOE set a compliance date of July 19, 2021, for the new energy conservation standards. *See Energy Conservation Program: Energy Conservation Standards for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 24,218 (May 26, 2017).

### 2. Pool Pump Motors

#### a. August 2017 DOE Public Meeting

On August 10, 2017, DOE held a public meeting to discuss development of energy conservation standards for pool pump motors. (JA000082; JA000084–

000125; JA000126–000230.)[3]  During that meeting, DOE discussed the history of the Pool Pump Rule and its efforts to initiate a subsequent proceeding for DPPP motors.  (JA000091; JA000134–000135.)[4]  It also presented a series of concepts involving the potential scope, definitions, metrics, test procedures, and analyses that could inform a DPPP motor rulemaking.  (JA000096–000122; JA000152–000229.) Representatives from both Zodiac and Hayward, another pool pump manufacturer, attended the meeting and offered comments emphasizing the need to align any new DPPP motor standards with those established in the Pool Pump Rule.  (JA000194– 000195.)

### b.    August 2018 Joint Stakeholder Petition to DOE

In August 2018, DOE received a joint petition ("Joint Petition") from a group of more than twenty interested stakeholders, including Zodiac and the California Energy Commission ("CEC").  (JA000231–000247.)  The Joint Petition asked DOE to issue a direct final rule with energy conservation standards for DPPP motors that

---

[3] DOE committed to holding the public meeting to discuss the need for energy conservation standards for replacement DPPP motors in responding to comments submitted in response to the Pool Pump Rule.  82 Fed. Reg. at 24,220.

[4] DOE identified 42 U.S.C. §6313(b) as the source of its authority to prescribe energy conservations standards for electric motors during the meeting.  (JA000092.)

reflected several consensus recommendations. (*Id.*)[5] Those recommendations included proposed definitions, prescriptive standards, and labeling and reporting requirements that would complement the standards in the Pool Pump Rule. (JA000236–000239.)

Of particular relevance here, the Joint Petition recommended that variable-speed-control technology be used in DPPP motors with a total horsepower range of between 1.15 and 5. (JA000237–000238.) That range aligned with the hydraulic horsepower thresholds that the Pool Pump Rule used to delineate the three equipment classes for pool filter pumps. (JA000238.) The Joint Petition acknowledged that variable-speed-control motors would improve the energy efficiency of pool filter pumps, which operate at different speeds in performing their various cleaning, filtering, sanitization, heating, treating, and chlorination functions. (JA000231–000233.)

Yet, the Joint Petition acknowledged that variable-speed-control technology would not be required for motors with a total horsepower of less than 1.5. (JA000238.) Manufacturers use these smaller-capacity motors in PCBPs, which are

---

[5] The Joint Petition cited DOE's authority to regulate "electric motors" and the requirements in 42 U.S.C. §6295(p)(4) as the basis for prescribing the direct final rule. (JA000239–000240.)

specifically designed to perform a single function, *i.e.*, bottom-side pool cleaning, under a single operating condition, *i.e.*, high head (or pressure) and low flow.

### c.    February 2019 Alternative Industry Proposal to DOE

In February 2019, representatives of two trade associations, the Association of Pool & Spa Professionals and the National Electrical Manufacturers Association ("NEMA"), together with Zodiac and others, met with DOE to discuss the Joint Petition and a new consensus industry standard for pool pump motors, namely, UL 1004-10. (JA000254.) While reiterating their support for the recommendations in the Joint Petition, these industry stakeholders asked DOE to also consider issuing a labeling requirement based on the UL 1004-10 standards. (JA000255–000266.) They explained that the proposed labeling requirement would align with the Joint Petition's consensus recommendations. (JA000263–000265.) In either scenario, they emphasized the need for DOE to act promptly to establish uniform, national energy conservation standards for pool pump motors. (JA000266.)

### d.    April 2020 CEC Energy Efficiency Regulations

Despite being a party to the Joint Petition, in February 2019, the CEC proposed its own energy efficiency regulations for replacement pool pump motors. *See* Replacement Pool Pump Motors, Docket No. 19-AAER-02. The CEC's proposal included, among other things, a variable-speed-control technology mandate for all replacement pool pump motors with a total horsepower of between 0.5 and

5.0. The Pool and Hot Tub Alliance ("PHTA") and NEMA opposed the mandate for replacement motors in the 0.5 to 1.15 total horsepower range. They noted that this aspect of the CEC's proposal was inconsistent with the Pool Pump Rule and the Joint Petition's consensus recommendations. PHTA and NEMA also noted that the CEC relied on erroneous assumptions in evaluating the costs, benefits, technical feasibility, and practicability of that proposal, particularly with respect to PCBPs. *See id.*, PHTA-NEMA Comments, TN# 232670; *id.*, Transcript of April 7, 2020 Public Hearing, TN# 232805. The CEC dismissed these concerns and, in an April 2020 resolution, adopted the proposed energy efficiency regulations for replacement pool pump motors without change. *See id.*, Dedicated-Purpose Pool Pumps and Replacement Dedicated-Purpose Pool Pump Motors Appliance Efficiency Rulemaking, TN # 232784.

### e.     October 2020 DOE Proposed Test Procedure and Labeling Requirements

DOE issued a proposed rule with a new test procedure and labeling requirement for DPPP motors in October 2020. *Energy Conservation Program: Test Procedure and Labeling Requirements for Dedicated-Purpose Pool Pump Motors*, 85 Fed. Reg. 62,816 (Oct. 5, 2020).[6] Consistent with the recommendations in the

---

[6] As discussed *infra* in Section II(B), DOE addressed the extent of its authority over "electric motors" at length in the preamble and concluded that any "state energy

Joint Petition, DOE proposed to apply these requirements to the four pool pump classes subject to performance-based standards in the Pool Pump Rule. *Id.* at 62,820–62,821. DOE also proposed to incorporate by reference certain definitions in a new industry standard, UL Standard 1004–10:2019, Outline of Investigation for Pool Pump Motors ("UL 1004–10:2019"), and testing requirements from another industry standard, CSA C747–09 (R2014), Energy Efficiency Test Methods for Small Motors ("CSA C747–09"). *Id.* at 62,821–62,823. DOE's proposal included labeling, disclosure, and reporting requirements as well. *Id.* at 62,823–62,832.[7]

### f.   July 2021 DOE Final Test Procedure Requirements

In July 2021, DOE published a final rule prescribing the new test procedures for DPPP motors but deferring further action on a labeling requirement. *Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pump Motors*, 86 Fed. Reg. 40,765 (July 29, 2021).[8] In explaining its decision not to finalize the

---

conservation standards, test procedures, or labeling requirements for DPPP motors—or any other electric motor—are preempted" under EPCA. *Id.* at 62,818.

[7] Zodiac attended DOE's subsequent public meeting on the proposed rule, (JA000274–000365), and submitted comments asking DOE to make compliance with the UL 1004-10:1029 requirements mandatory and to ensure the compliance date for the new requirements aligned with the July 19, 2021 compliance date for the Pool Pump Rule, (JA000366).

[8] DOE affirmed the preemption analysis discussed in Section II(B), *infra*, in describing its statutory authority over "electric motors" in the preamble to the final rule. *Id.* at 40,767.

proposed labeling requirements, DOE simply stated that it would address labeling, as well as any consideration of energy conservation standards, separately, and that comments regarding labeling or energy conservation standards would be addressed as appropriate if DOE elected to take up those issues by separate notice. *Id.* at 40,768.

With respect to the testing requirements, DOE largely tracked the approach laid out in the proposed rule. DOE applied the testing requirements to the four equipment classes of DPPPs subject to the performance-based standards in the Pool Pump Rule and incorporated by reference the definitions in the first edition of UL 1004–10:2020, as published on February 28, 2020, and the testing requirements in CSA C747–09, as revised through August 2016, for purposes of these provisions. *Id.* at 40,768–40,775.

### g.    June 2022 DOE Proposed Energy Conservation Standards

In June 2022, DOE published a proposed rule containing energy conservation standards for DPPP motors. *Energy Conservation Program: Energy Conservation Standards for Dedicated-Purpose Pool Pump Motors*, 87 Fed. Reg. 37,122 (June 21, 2022).[9] In an about-face from the approach taken in the Joint Petition and the

---

[9] DOE referenced Section 6313 as a "relevant" provision in discussing its authority to prescribe energy conservation standards for DPPP motors in the preamble to the proposed rule. *Id.* at 37,128.

October 2020 proposed rule, DOE proposed to divide pool pump motors into three equipment classes based solely on capacity (or size): (1) an extra-small size (less than 0.5 total horsepower), (2) a small size (between 0.5 and less than 1.15 total horsepower), and (3) a standard size (between 1.15 and less than 5.0 total horsepower). *Id.* at 37,123, 37,133–37,186. DOE also proposed requirements that would apply to the motors in each of the three equipment classes: extra-small-size motors would be subject to a 69% full load efficiency standard, and small- and standard-size motors would be subject to design requirements for freeze protection and variable-speed-control technology. *Id.* DOE proposed a two-year deadline for complying with these standards. *Id.* at 37,123.[10]

### h.    July 2022 DOE Public Meeting

On July 26, 2022, DOE held a public meeting to discuss the proposed rule. (JA000370–000431.) Zodiac, NEMA, PHTA, and other industry stakeholders all opposed the proposed variable-speed-control technology requirement for small-size motors during the meeting. (JA000375–000376, JA000384–000387, JA000394–000395, JA000396–000399, JA000401–000403, JA000408–000410, JA000414–

---

[10] DOE deviated from its ordinary process, which includes such initial steps as preparing a framework document and preliminary analysis or advanced notice of proposed rulemaking, in issuing the proposed rule. 87 Fed. Reg. at 37,130 (citing 10 C.F.R. pt. 430, subpart C, app. A). Despite that deviation, DOE denied requests from multiple stakeholders, including Zodiac (JA000367), to extend the public comment period for an additional 30 days (JA000368).

000419, JA000423–000429.)  The stakeholders emphasized that the proposal was inconsistent with the standards in the Pool Pump Rule, that DOE had not considered the potential impacts on pool pump manufacturers, and that a variable-speed-control motor would serve no useful purpose in PCBPs.  (JA000375, JA000385–000387, JA000396–000399, JA000401–000402, JA000408–JA000410, JA000414–000417, JA000423–000429.)  They also questioned DOE's decision to propose a motor design requirement that would effectively override the Pool Pump Rule, particularly given the significant resources that pool pump manufacturers had invested in complying with those standards.  (JA000417, JA000425–000427.)

### i.     August 2022 Industry Stakeholder Comments to DOE

Zodiac and other interested stakeholders renewed their objections to the proposed variable-speed-control technology mandate for PCBP motors in comments submitted after the public meeting.  (JA000432–000440 (Zodiac Comments); JA000441–000458 (PHTA-NEMA Comments); JA000459–000464 (Hayward Comments); JA000472–000475 (PHTA Supplemental Comments); JA000476–000487 (Zodiac Supplemental Comments).)  PHTA and NEMA reiterated that DOE had not adequately considered the impact of applying that requirement to small-size motors, particularly PCBPs.  (JA000442–000443, JA000445–000454.)  Zodiac also submitted a comparative field study, which demonstrated that DOE's analysis of the proposed variable-speed design requirement was flawed in several respects.

(JA000432–000440.)   The study established that the minimum average payback period—the time it would take consumers to recoup the cost of variable-speed PCBP motors—was nine years, nearly triple the 3.6-year period used in DOE's analysis. (JA000432, JA000437.)   The study also showed that, "[u]sing the lowest, readily available variable-speed motor on the market today, the variable-speed version of the PCBP actually consumes *more* power than its single-speed counterpart in two of the four test cases when operated above 3250 RPM (94% of its maximum speed capability)."  (JA000437 (emphasis added).)

### j.     September 2023 Pool Pump Motor Rule

On September 23, 2023, DOE issued the Pool Pump Motor Rule that is the subject of Zodiac's Petition.  88 Fed. Reg. 66,966.  The Rule prescribed new energy conservation standards for DPPP motors—including the variable-speed-control design requirement for small- and standard-size motors—without material change from the proposed rule.  *Id.* at 66,966.  DOE set a compliance deadline of September 29, 2025, for the extra-small-size and standard-size motor requirements, and September 28, 2027, for the small-size motor requirements.  *Id.*

## SUMMARY OF ARGUMENT

DOE exceeded its statutory authority in promulgating the Pool Pump Motor Rule. EPCA does not authorize DOE to prescribe energy conservation standards for definite purpose motors, including DPPP motors. Even if DOE did not exceed its authority under EPCA, the variable-speed-control design requirement for PCBP motors is arbitrary and capricious. That requirement is neither reasonable nor reasonably explained. For these reasons, the Court must vacate the Pool Pump Motor Rule.

## ARGUMENT

**I.    Venue is proper because Zodiac, a limited liability company formed in the State of Delaware, "resides" in the Third Circuit for purposes of 42 U.S.C. §6306(b)(1).**

### A.    Standard of Review

Zodiac addresses the question of venue as a threshold issue as directed by the Court's *sua sponte* January 3, 2024 Order. The Court applies *de novo* review to this pure question of law. *See, e.g.*, *Prater v. Dep't of Corr.*, 76 F.4th 184, 193 (3d Cir. 2023) (citing *Dewey v. Volkswagen A.G.*, 681 F.3d 170, 180 (3d Cir. 2012)) (*de novo* review applied to similar question of appellate court's jurisdiction).

**B.    Argument**

The Third Circuit is a proper venue under 42 U.S.C. §6306(b) for lodging the Petition for Review.  Section 6303(b)(1) includes an express venue provision, which states, in pertinent part:

> Any person who will be adversely affected by a rule prescribed under section … 6295 of this title may … file a petition with the United States court of appeals for the circuit in which such person resides or has his principal place of business, for judicial review of such rule.

42 U.S.C. §6306(b)(1).

Zodiac is a limited liability company formed in the State of Delaware and headquartered in California and is a "person" for purposes of Section 6306(b)(1). *Id.* §6202(2).  Zodiac can seek judicial review of the Pool Pump Motor Rule in two possible venues: (1) the circuit where it "resides" or (2) the circuit where it "has [its] principal place of business." *Id.* §6306(b)(1).  Zodiac agrees that its principal place of business is in California, and that venue would be proper in the Ninth Circuit. The only question that remains is whether, like any other "person," Zodiac "resides" in the Third Circuit under Section 6306(b)(1).  More than a century of case law answers that question in the affirmative.

The well-established default rule is that a corporation "resides" in its place of incorporation for venue purposes.[11]  The United States Supreme Court recognized that rule in *Shaw v. Quincy Mining Co.*, 145 U.S. 444, 450 (1892), and reaffirmed it in an "unbroken line of decisions" through the mid-1900s, *see Suttle v. Reich Bros. Constr. Co.*, 333 U.S. 163, 167 & n.7 (1948) (collecting cases); *see also American Cyanamid Co. v. Hammond Lead Prods., Inc.*, 495 F.2d 1183, 1184 (3d Cir. 1974) (quoting *Suttle*, 333 U.S. at 166 (quoting *Shaw*, 145 U.S. at 449)).  In its 1948 decision in *Suttle*, the Court acknowledged that while Congress had begun expanding the definition of "venue" in certain statutes—to authorize multiple venues, in both the corporation's place of "residence" and the place where it "may be 'found,' 'transacts business,' or has an agent to receive service of process"—the definition of "residence" remained constant.  *See Suttle*, 333 U.S. at 167.

The Court relied on this settled understanding of corporate residence in *Federal Power Commission v. Texaco, Inc.*, 377 U.S. 33 (1964), in interpreting the venue provision in the Natural Gas Act.  That provision authorized a party aggrieved by an order to "obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is

---

[11] An unincorporated association like a limited liability company is treated the same as a corporation for purposes of venue.  *See Denver & Rio Grande W. R.R. Co. v. Bhd. of R.R. Trainmen*, 387 U.S. 556, 559–560 (1967); *Nehemiah v. Athletics Cong. of U.S.A.*, 765 F.2d 42, 47 (3d Cir. 1985).

located or has its principal place of business." *Texaco*, 377 U.S. at 37 (quoting 15 U.S.C. §717r(b)).   Explaining that the terms "located" and "resides" are interchangeable for venue purposes, the Court reaffirmed the principle, dating to *Shaw*, that "the only residence of a corporation for purposes of federal venue was the State and district in which it had been incorporated." *Id.* at 38–39 (citing *Shaw*, 145 U.S. at 449–450).

Courts of appeals have continued to apply this principle uniformly across judicial-review statutes with venue provisions like Section 6306(b)(1).  *See, e.g.*, *American Energy Corp. v. Rockies Express Pipeline, Inc.*, 622 F.3d 602, 605 (6th Cir. 2010); *Sea Island Comprehensive Healthcare Corp. v. U.S. Dep't of Health & Human Servs.*, No. 02-1095, 2002 WL 31045954 (D.C. Cir. 2002) (*per curiam*). Likewise for the venue provision in 28 U.S.C. §2343, which authorizes direct judicial review of orders issued by certain federal agencies.  28 U.S.C. §2343 (laying venue in D.C. Circuit or "the judicial circuit in which the petitioner resides or has its principal office"); *see also, e.g.*, *Merchants Fast Motor Lines, Inc. v. Interstate Commerce Comm'n*, 5 F.3d 911, 921–922 (5th Cir. 1993); *ACLU v. FCC*, 774 F.2d 24, 26 (1st Cir. 1985).

Congress can certainly override the default rule.  For instance, in 28 U.S.C. §1391, the general venue statute for actions originally filed in federal district courts, Congress narrowed a corporate plaintiff's residence to "the judicial district in which

it maintains its principal place of business."  28 U.S.C. §1391(c)(2).  But EPCA's venue provision does not contain a similar limitation; rather, it explicitly retains both the petitioner's place of residence and its principal place of business as equally appropriate venue options.  42 U.S.C. §6306(b)(1).

DOE suggests that the district court venue statute, Section 1391, "*may* apply" to direct-review actions in the courts of appeals, casually inviting a sea change in federal procedural law without so much as a single supportive citation.  (Dkt. No. 6 at 2 (emphasis added).)  That approach finds no support in Section 1391 itself, in the dozens of direct-review venue provisions it would rewrite,[12] or in the case law.[13]

---

[12] *See, e.g.*, 7 U.S.C. §2(a)(1)(C)(v)(VI), §12a(9), §1600; 15 U.S.C. §57a(e)(1)(A), §77i(a), §78y(a)(1), §78y(b)(1), §80a-42(a), §80b-13(a), §1193(e)(1), §1262(e)(3)(A), §1474(b)(1), §1710(a), §2060(a), §2618(a)(1)(A); 18 U.S.C. §843(e)(2); 21 U.S.C. §346a(h)(1), §348(g)(1), §355(h), §360g(a), §360kk(d)(1), §371(f)(1), §387*l*(a)(1); 27 U.S.C. §204(h); 28 U.S.C. §2343; 29 U.S.C. §210(a), §655(f); 30 U.S.C. §811(d); 33 U.S.C. §907(j)(4); 42 U.S.C. §2022(c)(2), §5405(a)(1), §7525(b)(2)(B)(ii), §8412(c)(1), §10139(a)(2); §45 U.S.C. §355(f); 49 U.S.C. §1153(b), §5127(a), §30161(a), §31141(f), §32503(a), §32909(a)(1), §32909(a)(2), §32915, §46110(a); *see also, e.g.*, 5 U.S.C. §7123(a); 15 U.S.C. §2615(a)(3); 20 U.S.C. §6083(f), §7973(e)(5); 21 U.S.C. §333(f)(6), (g)(6); 22 U.S.C. §6761(a)(5); 33 U.S.C. §1319(g)(8), §1321(B)(6)(g)(ii), §1369(b)(1); 42 U.S.C. §300j-7(a)(2), §6976(b), §9609(b); 43 U.S.C. §1656(d).

[13] Zodiac has identified only one district court decision that appears to have read Section 1391(c)(2) as implicitly overriding the default definition of "resides" in Section 6306(b)(1). *See NRDC v. U.S. Dep't of Energy*, No. 17 Civ. 6989, 2018 WL 1229733 (S.D.N.Y. Mar. 6, 2018).  In addition to being distinguishable in posture, the decision ignores both that the general federal venue statute applies only to "civil actions brought *in district courts* of the United States," 28 U.S.C. §1391(a)(1) (emphasis added), and that the Supreme Court has rejected its application to cases originating somewhere other than federal district court, *see, e.g.*, *Polizzi v. Cowles*

Moreover, Zodiac has identified at least fourteen direct-review statutes in which Congress omitted the term "resides" in laying venue.[14]  These statutes confirm, like Section 1391(c)(2), that Congress will leave no room for doubt when it intends to limit a corporate petitioner's residence to its principal place of business.  Congress did not so limit Section 6306(b)(1).  Because Zodiac resides in Delaware, venue is proper in this Circuit.

## II.    EPCA does not authorize DOE to prescribe energy conservation standards for DPPP motors.

### A.    Standard of Review

Section 706 of the APA requires a reviewing court to "hold unlawful and set aside" any agency action taken "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. §706(2)(C).  An excess-of-authority analysis requires the court to compare, side by side, "the claimed excessive action with the pertinent

---

*Magazines, Inc.*, 345 U.S. 663, 665 (1953) (Section 1392 "has no application" to removal actions).  There is no suggestion in Section 1391(c)(2)—much less the requisite "clear indication"—that Congress intended the provision to redefine corporate residence either broadly for all judicial-review actions brought in the original jurisdiction of the federal courts of appeals or specifically for actions filed in the courts of appeals under Section 6306(b)(1).  *See TC Heartland LLC v. Kraft Foods Group Brands, LLC*, 581 U.S. 258, 268 (2017) (when Congress intends to modify the "settled construction" of one statute by enactment or amendment of another, it "ordinarily provides a relatively clear indication" that intent).

[14] *See, e.g.*, 7 U.S.C. §8(b), §10a(a), §194(a), §228b-3(a); 12 U.S.C. §1467a, §1848; 15 U.S.C. §687a(e); 21 U.S.C. §457(d), §607(e), §877, §1036(b), §1041(c)(2)(A), 1047; 42 U.S.C. §263a(k)(1).

statutory authority," viewing the text of the applicable statute as a whole. *Western Union Tel. Co. v. FCC*, 541 F.2d 346, 354 (3d Cir. 1976) (citing *Federal Power Comm'n v. Moss*, 424 U.S. 494 (1976)); *Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 680 (3d Cir. 2014). In conducting this analysis, traditional principles of statutory interpretation apply, *City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276, 284 (3d Cir. 2019), with the "cardinal canon" being that, in the absence of ambiguity, the plain language controls, *In re Phila. Newspapers*, 599 F.3d 298, 304 (3d Cir. 2010).

## B. Argument

At the outset, Zodiac addresses two overarching points that are germane to the statutory analysis that follows. *First*, EPCA does not grant DOE broad authority to prescribe whatever standards may be necessary to promote energy efficiency or conservation for industrial equipment. *Cf., e.g.*, *Wilkinson v. Abrams*, 627 F.2d 650, 660 (3d Cir. 1980) (considering whether regulation came within agency's "quite broad" authority to prescribe rules "as necessary" to administer statute). Rather, Congress did not authorize DOE to prescribe energy conservation standards for industrial equipment under EPCA until 1992 and has granted DOE only limited additional authority to do so since that time. Indeed, with respect to energy conservation standards for industrial equipment, EPCA authorizes DOE to do just two things: issue new standards where Congress has expressly authorized it to do so,

-28-

*see* 42 U.S.C. §6313(f)(4), §6313(g), §6317; and amend existing standards, regardless of whether those were established by Congress or DOE, *id.* §6295(m), §6316(a).    Anything beyond that—including prescription of new energy conservation standards for DPPP motors—is unlawful.

*Second*, DOE has vacillated on the source of its authority to prescribe energy conservation standards for DPPP motors *within this rulemaking*.    After initially claiming Section 6313(b) authorized those standards, (JA000092), and then maintaining Section 6313 was a "relevant" source of authority in the proposed rule, 87 Fed. Reg. at 37,128, DOE said the opposite in the Pool Pump Motor Rule, *i.e.*, that Section 6313(b) does *not* authorize DOE to prescribe energy conservation standards for DPPP motors, 88 Fed. Reg. at 66,971–66,972.  This bait-and-switch as to the source of DOE's authority to even issue the Pool Pump Motor Rule raises serious questions about the propriety of the entire rulemaking process and provides an independent basis for vacating the Pool Pump Motor Rule.  *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079–1083 (D.C. Cir. 2009); *Environmental Integrity Project v. E.P.A.*, 425 F.3d 992, 996–998 (D.C. Cir. 2005).

### 1.    Section 6313(b) does not authorize DOE to prescribe energy conservation standards for DPPP motors.

The pertinent subchapter of EPCA, Subchapter III, consists of two parts: Part A, which establishes an energy conservation program for certain consumer products, 42 U.S.C. §§6291–6309, and Part A-1, which adopts some aspects of Part A for

application to certain industrial equipment, *id.* §§6311–6317. Part A-1 defines "covered equipment" to include eleven enumerated categories of industrial equipment, including "[e]lectric motors and pumps," *id.* §6311(1)(A)–(K).[15] An "electric motor" is defined for these purposes to include two types of general purpose electric motors, as well as definite purpose motors, special purpose motors, open motors, enclosed motors, and small electric motors, all of which are separately defined. *Id.* §6311(13)(A)–(G).

Congress established statutory energy conservation standards for "electric motors" in 42 U.S.C. §6313(b), but these standards are subject to an exception for "definite purpose motors." 42 U.S.C. §6313(b)(1). DOE acknowledged in the Pool Pump Motor Rule that the standards in Section 6313(b) do not apply to DPPP motors, which are "definite purpose motors" covered by the exception in Section 6313(b)(1), and that "there are no other provisions in 42 U.S.C. [§]6313 that would apply to DPPP motors." 88 Fed. Reg. at 66,971–66,972. Accordingly, it is undisputed that nothing in Section 6313 authorizes DOE to prescribe energy conservation standards for DPPP motors.

---

[15] As discussed *infra* in Section III(B)(3), Part A-1 also includes a catchall provision that allows DOE to classify "any other type of industrial equipment . . . as covered equipment" by rule. *Id.* §6311(1)(L) (citing 42 U.S.C. §6312(b)).

### 2. No other provision in EPCA authorizes DOE to prescribe energy conservation standards for DPPP motors.

Nor has Congress explicitly authorized DOE to prescribe energy conservation standards for definite purpose motors anywhere else in EPCA. Congress has done so for other types of covered equipment, *see* 42 U.S.C. §6313(f)(4) (authorizing energy conservation standards for walk-in coolers and freezers); *id.* §6313(g) (same for lighting power supply circuits); *id.* §6317 (same for high-intensity discharge lamps, distribution transformers, and small electric motors), but not for definite purpose motors. *See id.* §6313; *see, e.g.*, *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 471 (5th Cir. 2024) (limited grant of authority under EPCA to regulate "water use" for specific covered products demonstrates Congress did not intend to "g[i]ve DOE power to regulate water use by *other* products"). Congress's only explicit statement on the subject is that energy conservations *should not* apply to definite purpose motors. 42 U.S.C. §6313(b)(1). The only reasonable interpretation of that statement—and the lack of separate authorization language elsewhere—is that Congress did not want any energy conservation standards to apply to definite purpose motors, including DPPP motors. *Compare, e.g.*, *id.* §6312(a) (identifying purpose as "improv[ing] the efficiency of electric motors and pumps and certain other industrial equipment in order to conserve the energy resources of the Nation"), *with id.* §6295(a)(2) ("*authoriz[ing] the Secretary* to prescribe amended or new

-31-

energy conservation standards for each type (or class) of covered product" (emphasis added)).

### 3. Section 6316 does not authorize DOE to exercise rulemaking authority that does not otherwise exist.

When amending EPCA to include certain industrial equipment in Part A-1, Congress did not establish freestanding administrative or implementation provisions for the new part. Congress instead borrowed aspects of Part A. 42 U.S.C. §6316. As relevant to electric motors, Section 6316(a) provides that certain sections of Part A—specifically, Section 6296(a), (b), and (d), Section 6295(*l*) through (s), and Sections 6297 through 6306—shall apply in Part A-1 "to the same extent and in the same manner" as in Part A. *Id.* §6316(a). Congress also provided an index of sorts for assimilating the borrowed provisions, instructing that references to Sections 6293, 6294, and 6295 in Part A should be considered references to Sections 6314, 6315, and 6313 in Part A-1, respectively, and swapping references in Part A to "this part," "product," and "Commission" for "part A-1," "equipment," and "Secretary" in Part A-1. *Id.* §6316(a)(1)–(4). Of the borrowed sections, only Section 6295 concerns development of energy conservation standards. *See id.* §6295.

Like Section 6313 does for Part A-1, Section 6295 establishes statutory energy conservation standards for certain of Part A's covered products, *id.* §6295(b)–(k), and authorizes DOE to prescribe standards for certain others, *id.* §6295(f)(1)(B), (f)(4)(D), (u)(1)(E)(i), (ff)(6), (v). Section 6295 also includes

-32-

mechanical provisions for development and implementation of those standards, and it is these provisions—namely, subsections (*l*) through (s)—that Congress incorporated into Part A-1. *Id.* §6316(a) (incorporating Section 6295(*l*)–(s)).

Not one of these borrowed provisions authorizes DOE to prescribe new energy conservation standards for definite purpose motors. *Cf. id.* §6295(m) (evaluation and amendment of existing standards); *id.* §6295(n) (petitions for amended standards); *id.* §6295(o), (q) (criteria for prescribing authorized standards); *id.* §6295(p) (procedures for prescribing authorized standards); *id.* §6295(r)–(s) (test procedures and compliance determinations for established standards). The only borrowed provision which speaks to DOE's authority to issue *new* energy conservation standards is the first, Section 6295(*l*). But that provision, even very liberally construed, does not authorize DOE to issue new standards for definite purpose motors. Applying Section 6316(a)'s borrowing index, Section 6295(*l*) provides only that "[t]he Secretary may prescribe an energy conservation standard for any type (or class) of covered ~~products~~ [equipment] of a type specified in paragraph (20) of section 6292(a) of this title," subject to various requirements set forth in subsections (*l*)(1), (o), and (p).[16] *See id.* §6295(*l*)(1), 6316(a)(3).

---

[16] The strikeout and bracketing revisions to this quotation reflect the effect of the borrowing provision on Section 6295(*l*) as incorporated into Part A-1.

The threshold problem, of course, is that paragraph 20 of Section 6292(a) does not include *any* "covered equipment" as defined in EPCA and thus cannot include definite purpose motors.  Paragraph 20 of Section 6292(a) is the catchall provision for consumer products specially classified as "covered products" by DOE *under Part A*.  *Id.* §6292(a)(20), (b).  While the borrowing index substitutes some sections in Part A for their counterparts in Part A-1, it does not do so for the parts' respective catchall provisions.  *Id.* §6316(a)(1).  Whatever Congress may have intended by incorporating subsection (*l*), it is beyond dispute that the plain text of that section, as adjusted by Section 6316(a), does not apply to definite purpose motors.[17]  *See Exxon Mobil Corp. Allapattah Servs., Inc.*, 545 U.S. 546, 565 (2005) (even if court suspects an "unintentional drafting gap," when language otherwise is unambiguous, "it is up to Congress rather than the courts to fix it" (citation omitted)).

But even if the Court were inclined to rewrite EPCA on the assumption Congress intended to swap the respective catchall provisions, the statute *still* would not provide authority for the Pool Pump Motor Rule.  *First*, electric motors and

---

[17] DOE has acknowledged that Congress failed to cleanly incorporate other subsections of Section 6295.  In the Pool Pump Motor Rule, for example, DOE noted that while Section 6295(m)'s compliance provisions have been incorporated into Part A-1, electric motors and DPPP motors are not listed and Section 6316(a) fails to "apply a cross reference on how to apply these paragraphs to electric motors or DPPP motors," so that portion of subsection (m) simply cannot apply to DPPP motors.  88 Fed. Reg. at 66,977.

pumps are a specifically enumerated category of covered equipment to which the catchall does not apply. *Compare* 42 U.S.C. §6311(1)(A) (identifying "[e]lectric motors and pumps" as first category of covered equipment), *with id.* §6311(1)(L) (establishing catchall for "[a]ny *other* type of industrial equipment" (emphasis added)). And Congress specifically excluded definite purpose motors in establishing energy conservation standards for electric motors in Section 6313(b). DOE cannot use the catchall provision to override that specific exception and prescribe standards for definite purpose motors. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–647 (2012); *Kannikal v. Att'y Gen. U.S.*, 776 F.3d 146, 150 (3d Cir. 2015); *see also Air Alliance Houston v. EPA*, 906 F.3d 1049, 1053, 1061–1066 (D.C. Cir. 2018); *American Petroleum Inst. v. EPA*, 706 F.3d 474, 479–480 (D.C. Cir. 2013); *American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995).

*Second*, DOE cannot simply anoint a type of industrial equipment as "covered equipment" under the catchall. DOE must issue a rule to that effect after determining the designation "is necessary to carry out the purposes of this part." 42 U.S.C. §6312(b). DOE also must meet four additional criteria, above and beyond the baseline requirements of Section 6295(o) and (p) that apply to all covered equipment, none of which is addressed in the Pool Pump Motor Rule. *Id.* §6295(*l*)(1)(A)–(D). Regardless of whether this approach could be used—and Zodiac maintains it is improper—the fact remains that DOE did not follow the

procedures in the catchall provision before issuing the Pool Pump Motor Rule, nor did it rely on these statutory provisions in prescribing that Rule. Accordingly, these hypotheticals cannot salvage the Rule as presently constituted.

### 4. DOE knows it lacks the authority under EPCA to prescribe energy conservation standards for DPPP motors.

That DOE has remained coy about the specific EPCA provision authorizing it to prescribe energy conservation standards for DPPP motors is telling. During the initial August 2017 public meeting, DOE pointed to Section 6313(b) as the source of that authority for electric motors, including DPPP motors. (JA000092.) DOE continued to describe Section 6313 as a relevant source of authority in the proposed rule and began broadly invoking the definition of "electric motor"—which, of course, contains no authorizing language and merely defines what qualifies as "covered equipment"—for that same purpose. 87 Fed. Reg. at 37,129 (citing 42 U.S.C. §6311(1)(A)). DOE made similar broad invocations of authority in the Pool Pump Motor Rule while at the same time purporting to "clarif[y]" that Section 6313(b) does not authorize energy conservation standards for DPPP motors after all. 88 Fed. Reg. at 66,971–66,973.

DOE's complete reversal on the applicability of Section 6313(b) at the end of the rulemaking process is troubling. DOE had twice endorsed the contrary position in concluding that EPCA's federal preemption provision applies to all electric motors, including DPPP motors, regardless of whether federal labeling

requirements, test procedures, or energy conservation standards have been established. *See* 85 Fed. Reg. at 62,818; 86 Fed. Reg. at 40,767. Reversing a prior position on the applicability of federal preemption to *an entire category of industrial equipment* is hardly a mere clarification.[18] In any event, DOE's dubiety with respect to whether EPCA authorizes energy conservation standards for DPPP motors suggests it already knows the truth: there is simply no authority to find.

At bottom, EPCA's grant of regulatory authority is not as broad as DOE might like. *See, e.g.*, *Louisiana*, 90 F.4th at 470–472 (after searching EPCA, stating "it is unclear how or why DOE thinks it has *any* statutory authority to regulate 'water use' in dishwashers and washing machines" absent clear grant of authority). Its authority is limited to issuing new energy conservation standards where expressly authorized by Congress, *see* 42 U.S.C. §6313(f)(4), §6313(g), §6317, and amending standards once established, *id.* §6295(m), §6316(a). The Pool Pump Motor Rule fits within neither of these limited authorizations and therefore must be vacated as having been issued in clear excess of agency authority.

---

[18] Zodiac recognizes that federal preemption of state energy conservation standards for DPPP motors is not squarely before the Court. For purposes of preserving the issue, Zodiac notes its agreement with DOE's initial determination, which is consistent with Part A's preemption rules, as adopted into Part A-1.

**III.    Even if EPCA authorizes DOE to prescribe energy conservation standards for DPPP motors, the requirements for PCBP motors are arbitrary and capricious.**

**A.    Standard of Review**

An agency rule is arbitrary and capricious if the agency "failed to consider an important aspect of the problem," "relied on factors which Congress has not intended it to consider," or produced a decision that is "unreasoned." *United Refining Co. v. EPA*, 64 F.4th 448, 456 (3d Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The requirement of a reasoned decision also means the agency cannot contradict its prior rules or existing policy *sub silentio* and, importantly, that it must meaningfully consider any reliance interests that may be at stake if it consciously decides to change its position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).  DOE's decision in the Pool Pump Motor to mandate the use of variable-speed-control motors in PCBPs violates each of these settled maxims.

**B.    Argument**

**1.    DOE failed to reasonably explain its refusal to establish a separate equipment class for PCBP motors.**

DOE erred in denying Zodiac's request to create a separate equipment class for PCBP motors.  (JA000432–000440; JA000442–000443, JA000444–000453.) DOE's decision is wrong, initially, because it relied on an inapplicable standard.

DOE cited Section 6295(q) as providing the framework for equipment classification. 88 Fed. Reg. at 66,978–66,979, 66,983 (citing 42 U.S.C. §6295(q), §6316(a)). Subsection (q), however, establishes only when DOE must establish a different "level of energy use or efficiency" for different "group[s]" within "a type (or class)" of covered equipment. 42 U.S.C. §6295(q), §6316(a). That is, subsection (q) presupposes existence of an equipment class and tells DOE when it must assign "higher or lower" energy use or efficiency levels to groups *within* that class based on specific criteria. *Id.* §6295(q).

Neither Zodiac nor anyone else ever asked to be assigned an "energy use or efficiency" level different than other motors within the DPPP class; that request would have made no sense, because the variable-speed-control design requirement is not an "efficiency level" that can be adjusted up or down. Rather, Zodiac asked that PCBP motors be designated as a separate *equipment class*, just like the PCBPs they are a component of, based on their unique application. The effect of DOE's misapplication of the statute is borne out in its response to stakeholder comments. DOE claimed, for example, that it could not consider the end-use application of PCBP motors in PCBPs because the applicable efficiency level (full load efficiency) does not change based on the motor's application. *See* 88 Fed. Reg. at 66,984. No one ever contended otherwise. But because DOE attempted to squeeze a square peg (a request for a *different equipment class*) into a round hole (a statute governing

*different efficiency levels* within an *existing* equipment class), its response fails to accurately capture, much less reason through, those comments.

DOE's analysis is flawed in other ways, too.  For example, DOE cursorily stated that it "*generally* does not consider end-use applications" in classifying equipment.  *Id.* at 66,976 (emphasis added).  Yet Congress excluded "definite purpose motors" from energy conservation standards in Section 6313(b)(1) precisely because those motors are "designed … *for use on a particular type of application.*" 42 U.S.C. §6311(13)(C) (emphasis added).  Once more: square peg (statutorily exempt class defined by end-use application), round hole (general preference against considering end-use application).  Whatever the merit of DOE's general preference in other contexts, EPCA makes clear that "type of application" is a legitimate basis for differentiating among equipment classes for definite purpose motors.

DOE also claimed that "there are no physical or technological distinguishing factors in a DPPP motor that could be used to identify a particular end-use DPPP application."  88 Fed. Reg. at 66,984.  That claim borders on disingenuity.  There are at least two factors that distinguish PCBP motors from other motors subject to the Pool Pump Motor Rule, both of which multiple stakeholders underscored: (1) PCBP motors are specifically designed for single-speed operation, and (2) PCBP motors are used exclusively in a particular end-use application, *i.e.*, as a component of the distinct PCBP equipment class that DOE itself repeatedly has acknowledged

has "distinguishing," "unique," and "specific characteristics."[19]  DOE's failure to recognize its internal inconsistency or reconcile its present decision with its prior conclusions is quintessential arbitrary and capricious decisionmaking.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("[u]nexplained inconsistency" with prior agency action is basis for finding action arbitrary and capricious); *Massachusetts v. EPA*, 549 U.S. 497, 534–535 (2007) (same when agency failed to provide "reasoned explanation" for changing course); *Comite' de Apoyo a los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 187–188 (3d Cir. 2014) (same for inconsistencies with prior positions, "especially" when public comments warn of implications of change).

As for DOE's remaining justifications, the assertion that there is no total horsepower range available for creating a separate equipment class for PCBP motors is both belied by the record and beside the point.  *Cf.* 88 Fed. Reg. at 66,984.  One

---

[19] *See, e.g.*, 82 Fed. Reg. at 5,669 ("DOE is distinguishing [PCBPs] from other pumps based on their unique flow and head output"); *id.* ("[PCBPs] must provide a high amount of head at a low flow rate to propel pressure-side pool cleaners along the bottom of the pool and to remove debris as the cleaner moves"); *id.* at 5,678 ("In the field, [PCBPs] are only operated at one speed."); 82 Fed. Reg. at 36,870 ("it is DOE's understanding that pressure-side pool cleaners are designed to be paired with pumps with specific characteristics (e.g., high head and low flow) and that manufacturers all design and market specific pumps intended for this application."); *id.* at 36,885 ("[PCBPs] … are dedicated-purpose pool pumps that are specifically designed to propel pressure-side pool cleaners along the bottom of the pool in pressure-side cleaner applications. These pressure-side cleaner applications require a high amount of head and a low flow.").

of the primary reasons for using the 1.15-total-horsepower limit in the standard-size motor class was to exclude PCBP motors. (*See, e.g.*, JA000231, JA000238.) That fact alone establishes that DOE knows how to accommodate PCBP motors in creating total-horsepower-based equipment classes. More importantly, DOE's position assumes total horsepower range is the only way to define a separate equipment class for DPPP motors. The definition of "definite purpose motor" in Section 6311(13)(C), and DOE's own rationale in creating a separate equipment class for PCBPs, make clear that is not the case.[20]

### 2. DOE acted arbitrarily and capriciously in mandating variable-speed-control technology for PCBP motors.

DOE's decision to impose the variable-speed-control design requirement on PCBP motors that operate at only one speed is the pinnacle of arbitrary and capricious rulemaking. There is no dispute that such technology improves performance, cost-effectiveness, and energy efficiency of pool pump systems—like pool pump filtration systems—that perform varied functions (cleaning, filtration, heating, treating, and chlorination) under varied operating conditions (variations in pressure and flow). (*See* JA000231–000232.) But variable-speed-control motors

---

[20] Congress's decision to exclude definite purpose motors from the horsepower-based energy conservation standards for general purpose motors, and to authorize DOE to provide exceptions and exemptions from those standards for other types or classes of motors in any event, further demonstrates the fundamental flaw in that reasoning. *See* 42 U.S.C. §6313(b)(1), (b)(3).

serve no purpose for pool pump systems, like PCBP systems, that perform one function (cleaning) under one operating condition (high head and low flow).[21] That is exactly why manufacturers use only single-speed motors in PCBPs. The members of the DPPP Working Group, parties to the Joint Petition, and DOE itself recognized all of this throughout the rulemaking process.

DOE nevertheless applied the variable-speed-control design requirement to PCBP motors. In doing so, DOE failed to consider salient statutory standards for determining whether the design requirement was economically justified or otherwise necessary. It failed to adequately engage with comments and evidence (to say nothing of its own prior determinations) establishing that such technology has no utility and is not cost-effective for PCBP motors. And it failed to consider the inextricable relationship between the Pool Pump Motor Rule and its companion Pool Pump Rule. For any or all of these reasons, the Court must set aside the Pool Pump Motor Rule, at minimum with respect to PCBPs.

---

[21] DOE's representative on the DPPP Working Group, John Cymbalsky, noted as much during a meeting in January 2016. (JA001585–001586 ("But the variable speed motors can be very helpful saving energy if there's a variable load. If there's not a variable load, and for some reason it just runs full out, it doesn't matter if you have a single speed or a multi-speed or then a thousand speeds, whatever, that it won't save any energy."))

### a. DOE failed to properly consider applicable statutory criteria in mandating the variable-speed-control design requirement for PCBPs.

As discussed *supra*, DOE does not have carte blanche to regulate the design of DPPP motors in prescribing an energy conservation standard.  DOE is limited to prescribing design requirements that achieve "maximum improvement in energy efficiency" and are "technologically feasible and economically justified."  42 U.S.C. §6295(o)(2)(A); *see id.* §6311(11) (defining "energy conservation standard" to include design requirements).  At bottom, whether a standard is economically justified turns on "whether the benefits of the standard exceed its burdens …, to the greatest extent practicable," as informed by certain statutory criteria.  *Id.* §6295(o)(2)(A)(2)(B)(i).

### i. DOE failed to adequately consider all salient statutory criteria.

DOE erred in failing to consider salient (and mandatory) statutory criteria. *First*, DOE did not adequately consider the economic impact of the proposed energy conservation standards on manufacturers of equipment subject to the Pool Pump Motor Rule.  *Id.* §6295(o)(2)(A)(2)(B)(i)(I), §6316(a)(3).  Manufacturers of PCBPs and PCBP motors are both subject to the variable-speed-control design requirement. DOE acknowledged as much in the Rule, asserting that a DPPP motor is a component of a DPPP.  88 Fed. Reg. at 66,978.  Yet, DOE only considered the economic impact of its design requirement on *motor* manufacturers.  *Id.* at 67,007–

67,011.  DOE did not consider the economic impact on *PCBP* manufacturers, even though it previously recognized that manufacturers specifically design those pumps to operate with single-speed motors.  PCBP manufacturers also warned DOE of the need to consider those economic impacts, particularly given substantial investments made in designing the pumps and complying with the Pool Pump Rule.  *Id.* at 66,977; *see Comite' de Apoyo*, 774 F.3d at 187–188; *see also Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11, 15–16 (D.C. Cir. 2015) (agency acts arbitrarily if it fails to "engage the arguments raised" and provide cogent response to serious objections of interested parties (citation omitted)).

*Second*, DOE relied on a faulty payback period analysis in assessing cost savings of the variable-speed-control design requirement for consumers. 42 U.S.C. §6295(o)(2)(A)(2)(B)(i)(II), §6316(a)(3).  Zodiac presented information establishing it would take a consumer at least *three times* the lifespan of a PCBP to recover the increased cost from the requirement.  (JA000432–000440.)  DOE dismissed that information, claiming it was insufficiently representative of the market and the range of possible installations when compared to DOE's study, which it touted for its "larger consumer sample" and use of "statistical distributions to reflect variability in the field."  88 Fed. Reg. at 67,003.  DOE's criticism of Zodiac's analysis again is disingenuous, given it was DOE that denied Zodiac the opportunity to develop the more fulsome analysis it later claimed was required—first by

deviating from its own rulemaking procedures and not developing a framework document and preliminary analysis or publishing an advance notice of proposed rulemaking, then by denying Zodiac's request for a short extension of the deadline for comments, *see* note 11, *supra*. In any event, the results of Zodiac's actual field study clearly cast doubt on the "statistical distributions" DOE relied upon "to reflect variability in field." 88 Fed. Reg. at 67,003. DOE's motor-only analysis, *see, e.g.*, *id.* at 66,991 (acknowledging its analysis "considers the motor only"), and its refusal to consider costs and conditions related to the PCBPs that would actually use the motors, (JA000432–000440; JA000442–000443, JA000444–000453), hardly "reflect[s] the entire range of possible installation costs, energy usage and usage conditions …, and related operating costs." 88 Fed. Reg. at 67,003.

*Third*, DOE did not consider "the lessening of the utility or the performance" of PCBP systems that would result from the variable-speed-control design requirement. 42 U.S.C. §6295(o)(2)(A)(2)(B)(i)(IV), §6316(a)(3). As explained in more detail in Section III(B)(2)(d) *infra*, mandating a more expensive motor technology with default operating speeds that a consumer will never actually use clearly lessens the utility of a PCBP system. That is particularly true because a variable-speed motor may be more prone to failure than a single-speed motor, which has fewer electrical components. (*See* JA000528.) DOE's failure to engage with these salient criteria in the Pool Pump Motor Rule is arbitrary and capricious.

> ii. **DOE erred in refusing to establish a separate group for PCBP motors within the DPPP motors equipment class under Section 6295(q).**

Even if DOE had properly considered the applicable statutory criteria in prescribing the variable-speed-control design requirement for DPPP motors, it failed to justify its refusal to establish a special rule for PCBP motors under Section 6295(q).[22] Subsection (q) allows DOE to establish different standards for any group of covered equipment that, in relevant part, has a capacity or "other performance-related feature" that distinguishes it from the broader class. 42 U.S.C. §6295(q)(1). In deciding whether a given feature warrants separate treatment, DOE must consider "the utility to the consumer" of the feature as well as any other factors DOE deems appropriate. *Id.*

DOE's failure to establish a special rule for PCBP motors cannot be squared with consumer utility. As noted *passim*, manufacturers specifically design PCBPs to perform a single function under a single operating condition with a single-speed motor. That is a cost-effective, energy-efficient design that provides utility to the consumer. 88 Fed. Reg. at 67,002. A variable-speed-control motor does not provide

---

[22] Zodiac offers this argument in the alternative to its argument in Section III(B)(1), in the event the Court interprets subsection (q) to apply equally to design requirements and energy use and efficiency levels as well as to both equipment classes and groups.

comparable utility—there is simply no situation in which a consumer would need to use multiple speeds in operating a PCBP, much less all *four* speeds contemplated by the variable-speed-control design requirement. And again, as DOE itself recognized, requiring variable-speed technology can actually *reduce* reliability of these systems by introducing unnecessary components "that may be prone to failure." (JA000528.) DOE's refusal to establish a separate group for PCBPs under subsection (q), exempt from the variable-speed-control design requirement, is unjustifiable under these circumstances.

**b.    The variable-speed-control design requirement for PCBP motors is not necessary under Section 6295(r).**

Nor is the variable-speed-control design requirement justified under Section 6295(r). Section 6295(r) authorizes DOE to impose, as part of a new energy conservation standard, "any requirement" that DOE determines is "necessary to assure" that equipment subject to the standard meets energy efficiency levels specified in the standard. *See* 42 U.S.C. §6295(r), §6316(a). DOE did not establish *any* energy efficiency levels in the Pool Pump Motor Rule, let alone levels that might be contingent upon a variable-speed-control motor requirement under subsection (r).

So, too, for any claim that the variable-speed-control design requirement is necessary to assure *PCBPs* meet the energy conservation standards in the Pool Pump Rule. While DOE suggested in the Pool Pump Motor Rule that a PCBP "*may* be

able to achieve a higher … WEF score" and "energy *could* be conserved by operating the [PCBP] at a reduced speed" in some scenarios, 88 Fed. Reg. at 66,985–66,986 (emphasis added), neither observation comes close to suggesting a variable-speed requirement is *necessary* to achieve the Pool Pump Rule's standards, 42 U.S.C. §6295(r), §6316(a).   The minimum WEF score is the only applicable energy conservation standard for purposes of either rule, and a PCBP is perfectly capable of achieving that minimum level of energy efficiency without a variable-speed motor. *See, e.g.*, 82 Fed. Reg. at 36,885.  DOE therefore cannot seek refuge for the variable-speed-control technology requirement in subsection (r).

**c.     DOE failed to consider the relationship between the Pool Pump Motor Rule and the companion Pool Pump Rule.**

DOE failed to consider a related and equally important aspect of the problem when it ignored the interaction between the Pool Pump Rule and the Pool Pump Motor Rule, and the impact that the variable-speed-control design requirement would have on existing energy conservation standards for PCBPs.  DOE analyzed the requirements in the final rule as a motor-only proposition, repeatedly stating that it either could not consider existing standards for DPPPs, would not consider them, or might consider them at some unspecified time in the future.  *See, e.g.*, 88 Fed. Reg. at 66,984 ("DOE notes that this rule concerns DPPP motors, not DPPPs."), 66985 ("DOE notes that this rule is specifically regarding the DPPP motor, not

-49-

DPPP, and therefore technology options considered are with regards to DPPP motors and not the whole DPPP system."), 66,986 ("DOE is only considering technology options that can be directly implemented as part of the DPPP motor."), 66,991 ("The analysis DOE conducted in the June 2022 NOPR, however, considers the motor only, as this rule is specific to the cost-effectiveness of the DPPP motor.").

The suggestion that DOE could not consider the DPPP standards in its DPPP motor rulemaking is incorrect as a matter of law. DOE has an affirmative obligation under the APA to consider and account for effects of a new rulemaking in light of "contemporaneous and closely related rulemaking." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). At minimum, DOE must engage and "come to grips with the obvious ramifications of its approach and address them in a reasoned fashion." *NRDC v. U.S. EPA*, 859 F.2d 156, 209–210 (D.C. Cir. 1988).

Motors and pumps operate as part of a system. *See, e.g.*, 1980 DOE Study at 1-2, 2-1 to 2-11. What DOE either did not appreciate (or more likely, consciously ignored) is that the energy efficiency of that system cannot be properly understood by considering one component in isolation from the other. *Id*. That is especially true in the context of the interrelated rulemakings at issue in this proceeding—indeed, DOE initiated the DPPP motor proceeding directly in response to concerns raised by the Pool Pump Rule, and alignment with the preexisting Pool Pump Rule was a fundamental issue raised by the commenters throughout this proceeding. *See,*

*e.g.*, *Portland Cement Ass'n*, 665 F.3d at 187.  DOE therefore acted arbitrarily and capriciously in failing to consider the Pool Pump Motor Rule's implications for its companion, the Pool Pump Rule.

> **d.**  **DOE acted arbitrarily and capriciously in applying UL 1004-10's four-speed operation requirement to PCBPs.**

Even if DOE had established that *some* variable-speed design requirement could improve the energy efficiency of PCBPs or their motors (and to be clear, it did not), its requirement that PCBP motors operate within a minimum of four predetermined speed ranges still is unjustifiable.  The Pool Pump Motor Rule incorporated the definition of "variable-speed control dedicated-purpose pool pump motor" from the UL 1004–10, Standard for Safety for Pool Pump Motors, Revised First Edition, Dated March 24, 2022 ("UL 1004–10:2022").  88 Fed. Reg. at 67,040. That definition requires that a DPPP motor be "capable of operating at four or more discrete user- or pre-determined operating speeds," one of which must be the maximum speed, with the other three falling within prescribed ranges relative to that maximum—one speed between 75% and 85% of the maximum, one between 45% and 55% of the maximum, and one above zero but less than or equal to 40% of the maximum.  *See* UL 1004–10:2022, §2.16.

Despite comments and evidence from Zodiac and others that this definition simply does not fit a PCBP application, DOE forged ahead, insisting UL 1004–

10:2022 is an "industry standard" that "does not specifically exclude PCBP applications" so "there is no technical reasoning to exclude application to PCBPs." 88 Fed. Reg. at 66,985. At risk of belaboring the point, a four-speed requirement achieves nothing (save a higher price) for the consumer, because the consumer will never use all of them in operating a PCBP system. DOE has identified no utility in requiring a variable-speed motor in a PCBP system at all, much less one with speeds at or below 55% of the maximum. DOE's own representative on the DPPP Working Group revealed the flaw in that approach: for motors like PCBP motors that run "full out" without a variable load, "it doesn't matter if you have a single speed or a multi-speed or then a thousand speeds, … *it won't save any energy*." (JA001585–001586 (emphasis added)); *see Louisiana*, 90 F.4th at 472 ("[O]ne important aspect of [the] problem is whether appliance regulations *actually reduce* energy and water consumption.").

In addition to the UL definition's practical incompatibility with PCBPs, application of that definition to PCBPs is at odds with the UL Standard itself. The definitional and operational test provisions of the UL Standard only apply to motors in the 1.15 to 5.0 total horsepower range. *See* UL 1004–10:2022 §5.1 (operational test requirements only apply to DPPP motors with total horsepower at or above 1.15); *id.* §1.3 (overall applicability of UL 1004–10:2022 limited to DPPP motors with total horsepower at or above 5.0). That limitation aligns not with PCBP motors,

-52-

but with motors used in pool filtration pump systems, the hydraulic horsepower ranges used in creating the three equipment classes for pool filtration systems in the Pool Pump Rule, and the Joint Petition's consensus recommendations for applying the variable-speed-control design requirement to DPPP motors—which explicitly recognized that "[PCBPs] can continue to be single speed." (JA000231.) Thus, even if *some* variable-speed requirement were justifiable for PCBP motors, DOE's adoption of the four-speed requirement in the Pool Pump Motor Rule fires well wide of the mark.

## IV.    The Pool Pump Motor Rule must be vacated.

Section 706 of the APA requires that a reviewing court must "hold unlawful *and set aside*" any agency action taken in excess of statutory authority or shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A), (C) (emphasis added). As used in Section 706, the "set aside" clause is not a disjunctive option; it is a conjunctive mandate. *See Abington Mem. Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984); *see also Reese Bros., Inc. v. United States*, 447 F.3d 229, 235–236 (3d Cir. 2006) ("unless the context dictates otherwise," the word "and" is presumed to be used in the conjunctive sense). DOE exceeded its statutory in issuing the Pool Pump Motor Rule. And even if it did not, the design requirements for PCBP motors are arbitrary and capricious. Vacatur is the only appropriate remedy under Section 706.

Zodiac recognizes that this Court and others have concluded that remand without vacatur may be appropriate if curative rulemaking is "conceivable." *See Prometheus Radio Project v. FCC*, 824 F.3d 33, 52 (3d Cir. 2016). These decisions take their cue from *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) (citations omitted), in which the D.C. Circuit sanctioned remand without vacatur for an agency rule that was "inadequately supported." 988 F.2d at 150. The effect of that approach is to leave the rule in place while the "agency works to correct its errors." *Comite de Apoyo a los Trabajadores Agricolas v. Solis*, 933 F. Supp. 2d 700, 714 (E.D. Pa. 2013). But the Pool Pump Motor Rule is not just deficient—it is invalid *per se* for want of statutory authority. That lack of authority is not a problem DOE can fix on remand; only Congress can do that. *See id.* ("[R]emand without vacatur is far less logical where, as here, a court finds that a rule directly contradicts an agency's authority.").

Further, remand without vacatur is only appropriate under *Allied-Signal* and its progeny if "the disruptive consequences" of vacating the Pool Pump Motor Rule outweigh "the seriousness of the … deficiencies" of DOE's actions. *Allied-Signal*, 988 F.2d at 150–151 (citation omitted); *see Prometheus Radio*, 824 F.3d at 52. As Zodiac has established, DOE failed to consider important aspects of the problem brought directly to its attention by commenters and repeatedly contracted itself in responding to those comments and in the final rule itself—*in addition to* failing to

reasonably explain various aspects of its decisionmaking and its ultimate mandate of the variable-speed-control design requirement for PCBPs. Nor are the consequences of vacatur disruptive. Vacatur restores the status quo intended by Congress, as evidenced by its exemption of definite purpose motors from energy conservation standards and its decision not to authorize DOE to issue its own standards by regulation.

Finally, the consequences of not vacating the Pool Pump Motor Rule are highly disruptive. DPPP motor manufacturers will incur costs to comply with regulations that are unlawful, and they cannot recover those costs from DOE. Consumers will suffer, too, being forced to pay more for an unnecessary technology with no reciprocal utility, at least in a PCBP application. And of course, the public interest suffers when unlawful regulations (particularly *unauthorized* regulations) remain in effect. The Court therefore should vacate the Pool Pump Motor Rule in its entirety, or at minimum as applied to PCBPs, and remand the matter for further proceedings *only* if DOE is able to identify some authority within EPCA to prescribe new energy conservation standards for DPPP motors.

## **CONCLUSION**

For the foregoing reasons, the Court should vacate the Pool Pump Motor Rule

under Section 706 of the APA.

Respectfully submitted,

*/s/ Keith J. Coyle*
Keith J. Coyle, Esquire
D.C. Bar ID No. 61558
Christina Manfredi McKinley, Esquire
P.A. Bar ID No. 320002
Stefanie Pitcavage Mekilo, Esquire
P.A. Bar ID No. 312720
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com
smekilo@babstcalland.com
*Counsel for Petitioner Zodiac Pool
Systems LLC*

Dated: August 7, 2024

## **CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, as determined by the word-count function of Microsoft Word and excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,470 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3.      All counsel of record are members in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

4.      The electronic version of this Brief for Petitioner is identical to the paper copies of the brief to be filed with the Court.

5.      A virus detection program, Windows Security Virus & Threat Prevention, version 1.407.732.0, was run on the electronic version of the brief and no viruses were detected.

*/s/ Keith J. Coyle*
Keith J. Coyle, Esquire
*Counsel for Petitioner*

Dated: August 7, 2024

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d) and Local Appellate Rule 31.1(d), I hereby certify that the foregoing "Brief of Petitioner Zodiac Pool Systems LLC," was electronically filed through this Court's CM/ECF system, which will send a notice of filing to the counsel registered to receive service through the Court's CM/ECF system via electronic filing.

*/s/ Keith J. Coyle*
Keith J. Coyle, Esquire
*Counsel for Petitioner*

Dated: August 7, 2024