**ORAL ARGUMENT REQUESTED**

No. 23-3094

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

ZODIAC POOL SYSTEMS LLC,
*Petitioner*,

v.

UNITED STATES DEPARTMENT OF ENERGY,
*Respondent*.

---

On Petition for Review of a Final Rule
from the United States Department of Energy

---

**REPLY BRIEF OF PETITIONER
ZODIAC POOL SYSTEMS LLC**

---

Keith J. Coyle, Esquire
Christina Manfredi McKinley, Esquire
Stefanie Pitcavage Mekilo, Esquire
Babst, Calland, Clements & Zomnir, P.C.
Two Gateway Center
Pittsburgh, PA 15222
(412) 394-5400
kcoyle@babstcalland.com
cmckinley@babstcalland.com
smekilo@babstcalland.com
*Counsel for Petitioner*
*Zodiac Pool Systems LLC*

Dated: August 7, 2024

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ..................................................................................... iii

GLOSSARY...............................................................................................................vi

INTRODUCTION .......................................................................................................1

STATUTES AND REGULATIONS ...........................................................................2

ARGUMENT ..............................................................................................................2

    I.    Zodiac's excess-of-authority argument is a purely legal question
        properly before this Court. .............................................................................2

            A.    The Supreme Court's decision in *Loper Bright* felled
                 *Chevron* and, with it, the deference-based exhaustion
                 doctrine on which DOE relies.................................................................2

            B.    Zodiac did not forfeit its excess-of-authority argument. ............4

    II.    DOE exceeded its statutory authority in issuing the Pool Pump
       Motor Rule. .....................................................................................................8

            A.    DOE has not identified any provision in EPCA
                 authorizing it to issue energy conservation standards for
                 DPPP motors. .........................................................................................8

            B.    The Court should accord no deference to DOE's evolving
                 interpretation of EPCA. .........................................................................13

    III.   The variable-speed-control mandate for PCBP motors is arbitrary
       and capricious..................................................................................................14

            A.    DOE erred in applying Section 6295(q) to the variable-
                 speed-control design requirement. ..........................................................14

             B.    Even if Section 6295(q) applies, DOE erred in refusing to
                 create a separate equipment class for PCBP motors.................16

            C.    DOE does not have a reasonable basis for requiring
                 variable-speed-control motors in PCBPs................................19

            D.    DOE's remaining arguments are unpersuasive.........................24

    IV.   The Pool Pump Motor Rule must be vacated. ............................................25

CONCLUSION .........................................................................................................27

CERTIFICATE OF COMPLIANCE .................................................................28

CERTIFICATE OF SERVICE ........................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. Att'y Gen. U.S.*, No. 18-3320, 2024 WL 3352938 (3d Cir. July 10, 2024) ............................................................................................................4

*Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429 (3d Cir. 2005)..................................26

*Beth V. v. Carroll*, 87 F.3d 80 (3d Cir. 1996)........................................................4

*Bittner v. United States*, 598 U.S. 85 (2023). ......................................................20

*Bridgeport Hosp. v. Becerra*, No. 22-5249, 2024 WL 3504407 (D.C. Cir. July 23, 2024)....................................................................................................26

*CFPB v. Townstone Fin., Inc.*, No. 23-1654, 2024 WL 3370023 (7th Cir. July 11, 2024)......................................................................................................4

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) .............2

*Comite' de Apoyo a Los Trabajadores Agricolas v. Perez*, 774 F.3d 173 (3d Cir. 2014) ......................................................................................................20

*Corley v. United States*, 556 U.S. 303 (2009).........................................................10

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 144 S. Ct. 2440 (2024)...............................................................................................6, 7

*Cowpasture River Preservation Ass'n v. Forest Svc.*, 911 F.3d 150 (4th Cir. 2018) .........................................................................................................4

*CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076 (D.C. Cir. 2009) .............5

*Environmental. Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005) ...........5, 6

*Ergon-W. Va., Inc. v. United States*, 896 F.3d 600 (4th Cir. 2018)........................23

*Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287 (3d Cir. 2012) ...............................13

*Koretoff v. Vilsack*, 707 F.3d 394 (D.C. Cir. 2013)..................................................3

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2000) ...........................................................12

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ..................... passim

*Louisiana v. U.S. DOE*, 90 F.4th 461 (5th Cir. 2024) ............................................10

*Natural Res. Def. Council v. EPA*, 755 F.3d 1010 (D.C. Cir. 2014)........................7

*Ohio v. EPA*, 997 F.2d 1520 (D.C. Cir. 1993).........................................................3

*Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805 (3d Cir. 2016) ...........................26

*Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164 (D.C. Cir. 1994) ....................5, 7

*Riffin v. Surface Transp. Bd.*, 733 F.3d 340 (D.C. Cir. 2013) ..................................5

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .....................................................13

*Southwestern Pa. Growth All. v. Browner*, 121 F.3d 106 (3d Cir. 1997) .............3, 7

*United Refining Co. v. U.S. EPA*, 64 F.4th 448 (3d Cir. 2023) ..........................3, 7

*Walter O. Boswell Mem. Hosp. v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984) ...........23

**Statutes**

42 U.S.C. §6291 ....................................................................................................16

42 U.S.C. §6292 .....................................................................................................9

42 U.S.C. §6295 .......................................................................................... *passim*

42 U.S.C. §6306 ......................................................................................................3

42 U.S.C. §6311 .............................................................................................. 8, 15, 17

42 U.S.C. §6312 .....................................................................................................9

42 U.S.C. §6313 .......................................................................................... *passim*

42 U.S.C. §6316 ...................................................................................................8, 9

42 U.S.C. §6317 ............................................................................................. 10, 12

42 U.S.C. §7607 ......................................................................................................3

47 U.S.C. §405 ......................................................................................................3

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121
    Stat. 1492 .......................................................................................................11

**Other Authorities**

74 Fed. Reg. 10,671 (Mar. 9, 2009)......................................................................19

79 Fed. Reg. 59,090 (Oct. 1, 2014)........................................................................4

89 Fed. Reg. 11,434 (Feb. 14, 2024) ....................................................................9

*Energy Conservation Program: Energy Conservation Standards for
    Dedicated Purpose Pool Pump Motors*, 88 Fed. Reg. 66,966 (Sept. 28,
    2023) ................................................................................................ *passim*

*Energy Conservation Program: Energy Conservation Standards for
    Dedicated-Purpose Pool Pump Motors*, 87 Fed. Reg. 37,122 (June 21,
    2022) ........................................................................................... 6, 13, 21

*Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool
    Pump Motors*, 86 Fed. Reg. 40,765 (July 29, 2021) .....................................6, 15

*Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 36,858 (Aug. 7, 2017) ................................................ 15, 16

*Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pumps*, 87 Fed. Reg. 74,023 (Dec. 2, 2022) .......................................................20

**Regulations**

10 C.F.R. §431.462 ........................................................................................18

10 C.F.R. pt. 430, subpart C, app. A ............................................................21

# **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| DOE | United States Department of Energy |
| DPPP | Dedicated Purpose Pool Pump |
| DPPP Motor | Dedicated Purpose Pool Pump Motor |
| EPCA | Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871, as amended through the Energy Efficiency Improvement Act of 2015, Pub. L. No. 114-11, 129 Stat. 182 |
| Petitioner | Zodiac Pool Systems LLC |
| PCBP | Pressure Cleaner Booster Pump |
| PCBP Motor | Pressure Cleaner Booster Pump Motor |
| Pool Pump Rule | *Energy Conservation Program: Energy Conservation Standards for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 5,650 (Jan. 18, 2017) |
| Pool Pump Motor Rule | *Energy Conservation Program: Energy Conservation Standards for Dedicated Purpose Pool Pump Motors*, 88 Fed. Reg. 66,966 (Sept. 28, 2023) |
| Respondent | Department of Energy or DOE |
| WEF | Weighted Energy Factor |
| DPPP Working Group | Dedicated Purpose Pool Pump Working Group |
| Zodiac | Zodiac Pool Systems LLC |

## INTRODUCTION

In its opening brief, Petitioner Zodiac Pool Systems LLC ("Zodiac") laid bare the many defects permeating the final rule under review in this case, *Energy Conservation Program: Energy Conservation Standards for Dedicated Purpose Pool Pump Motors*, 88 Fed. Reg. 66,966 (Sept. 28, 2023) ("Pool Pump Motor Rule"). Zodiac explained that Respondent, the U.S. Department of Energy ("DOE"), reversed itself on a fundamental legal question in issuing the final rule; namely, DOE found, *sua sponte*, that the dedicated-purpose pool pump ("DPPP") motors at issue here are exempt from the energy conservation standards for electric motors in the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §6313(b)(1). Zodiac also explained that DOE had not identified any other provision in EPCA authorizing issuance of energy conservation standards for DPPP motors, and that even if such authority existed, the final rule's design requirements for a specific subset of DPPP motors known as pressure cleaner booster pump ("PCBP") motors are unlawful in any event.

DOE offers no serious answer to these arguments in its response brief. Rather, DOE relies on *ipse dixit*, unsubstantiated assertions, and its own theories of congressional intent, hoping the Court will defer to its "expertise" and ignore obvious flaws in its reasoning. The United States Supreme Court's decision last month in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), makes clear

that such atextual arguments cannot carry the day. In overruling the *Chevron*[1]

doctrine and restoring the federal judiciary's supremacy over questions of statutory

interpretation, *Loper Bright* represents a seismic shift in the judicial-review

landscape. This Court must now decide, *de novo*, whether DOE's actions comport

with EPCA. The answer to that question is a resounding no.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in an Addendum to this reply

brief.

## ARGUMENT[2]

**I.    Zodiac's excess-of-authority argument is a purely legal question properly before this Court.**

> **A.    The Supreme Court's decision in *Loper Bright* felled *Chevron* and, with it, the deference-based exhaustion doctrine on which DOE relies.**

DOE contends, somewhat summarily, that Zodiac forfeited its excess-of-

statutory-authority argument by failing to raise it during the rulemaking process.

(Resp't's Br. 23–24.) Initially, recent Supreme Court decisions cast serious doubt

---

[1] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[2] At the Court's direction, Zodiac addressed the threshold question of venue in its opening brief. (Pet'r's Br. 23–28.) In its response brief, DOE confirms it does not object to venue in this Court. (Resp't's Br. 17–18.)

on the continued vitality of the exhaustion cases DOE relies upon.[3]  Those cases have their roots in the *Chevron* doctrine and its animating premise—that agencies have special expertise in the statutes they administer, so their application of that expertise is entitled to judicial deference.  *See Southwestern Pa. Growth All. v. Browner*, 121 F.3d 106, 112 (3d Cir. 1997) (because EPA has "special expertise regarding the workings of the Clean Air Act," its interpretation "would inform the deliberations of this court"); *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (*per curiam*) (citing *Ohio v. EPA*, 997 F.2d 1520, 1528–1529 (D.C. Cir. 1993) (relying on "notion of deference to agency interpretations of law embodied in *Chevron*" in requiring exhaustion of "purely legal challenge")).

Four weeks ago in *Loper Bright Enterprises v. Raimondo*, the Supreme Court dismantled *Chevron* and rejected the premise on which its deference framework was based.  144 S. Ct. at 2273.  This Court and others have already recognized that *Loper Bright* effected a paradigm shift, requiring courts to consider questions of statutory

---

[3] Some federal statutes require exhaustion as a precondition to judicial review, *see, e.g.*, 42 U.S.C. §7607(d)(7)(B); 47 U.S.C. §405(a), but EPCA does not, 42 U.S.C. §6306.  Outside of trial-like adjudications, the absence of a statutory requirement should be the end of an exhaustion argument regardless of the nature of the issue raised.  *See United Refining Co. v. U.S. EPA*, 64 F.4th 448, 457 (3d Cir. 2023) (explaining "the characteristics of the proceeding—that is, whether the proceeding is more like a common law adversarial proceeding or a civil law inquisitorial proceeding—predominate" in deciding whether to require exhaustion).  While this Court has previously applied an exhaustion requirement in a rulemaking context, *Loper Bright* calls into question the propriety of such requirements—at minimum, as to purely legal questions—going forward.

interpretation and the scope of agency authority "*de novo*." *See Aguilar v. Att'y Gen. U.S.*, No. 18-3320, 2024 WL 3352938, *3 n.3 (3d Cir. July 10, 2024); *CFPB v. Townstone Fin., Inc.*, No. 23-1654, 2024 WL 3370023, *5 n.15 (7th Cir. July 11, 2024). Exhaustion of purely legal questions—as to which an agency has no special expertise and can be accorded no deference—serves no useful purpose in a post-*Chevron* world.[4] Federal courts, and federal courts alone, are the ultimate arbiters of these questions. Accordingly, this Court need look no further than *Loper Bright* to conclude that Zodiac's statutory authority argument is properly before it.

### B. Zodiac did not forfeit its excess-of-authority argument.

The Court need not decide whether *Chevron*-based exhaustion doctrine survives *Loper Bright*, however, because even under existing case law, it would not apply. DOE did not make the statutory-authority determination at issue—nor the predicate finding underlying it (that DPPP motors are definite purpose motors)—until the final rule. 88 Fed. Reg. at 66,966, 66,971. And, unlike some statutes, EPCA does not authorize parties to seek reconsideration before the agency. 79 Fed. Reg. 59,090, 59,091 (Oct. 1, 2014). The instant petition therefore is Zodiac's first opportunity to challenge DOE's new theory of statutory authority. Exhaustion is not

---

[4] Indeed, even before *Loper Bright*, courts regularly declined to require exhaustion for purely legal questions. *E.g.*, *Cowpasture River Preservation Ass'n v. Forest Svc.*, 911 F.3d 150, 182–183 (4th Cir. 2018) (collecting cases, including *Beth V. v. Carroll*, 87 F.3d 80 (3d Cir. 1996), recognizing exception), *rev'd and remanded on other grounds*, 590 U.S. 604 (2020).

required under these circumstances. *See Riffin v. Surface Transp. Bd.*, 733 F.3d 340, 343 (D.C. Cir. 2013) (citing *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009)); *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1170 (D.C. Cir. 1994).

That principle is all the more important when the final rule represents a reversal of the agency's prior position. A final rule that does an about-face from the proposed rule—with no opportunity for parties to address the change—violates fundamental precepts of notice-and-comment rulemaking. *Environmental Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (agencies cannot "use the rulemaking process to pull a surprise switcheroo on regulated entities").

Yet that is precisely what DOE did here. DOE asserted in an August 2017 public meeting and two subsequent rulemaking documents that 42 U.S.C. §6313 authorized it to issue energy conservation standards for DPPP motors because they are "electric motors."[5]    (JA000092); *Energy Conservation Program: Energy*

---

[5] DOE characterizes the August 2018 Joint Petition as evidence Zodiac previously took a contrary position regarding DOE's statutory authority. (Resp't's Br. 18, 24.) Zodiac and the other parties who joined the effort can hardly be blamed for relying on DOE's prior representations about the extent of its statutory authority in preparing the Joint Petition. After all, DOE has been administering EPCA since 1975, and Section 6313(b) in particular since 1992, and the Pool Pump Rule was the first time DOE had ever sought to regulate the equipment at issue here. In any event, DOE did not grant the relief sought in the Joint Petition and instead issued a notice of proposed rulemaking. DOE did not reverse its position on the applicability of Section 6313(b) until the end of that proceeding.

*Conservation Standards for Dedicated-Purpose Pool Pump Motors*, 87 Fed. Reg. 37,122, 37,128 (June 21, 2022); *see also Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pump Motors*, 86 Fed. Reg. 40,765, 40,767 (July 29, 2021). DOE later reconsidered and reversed that determination, *sua sponte*, in the Pool Pump Motor Rule, finding DPPP motors actually are *not* among the category of motors subject to Section 6313(b). 88 Fed. Reg. at 66,971 ("Upon further consideration, however, DOE is clarifying here that none of the provisions in 42 U.S.C. 6313 apply to DPPP motors…."). Only after having come to that realization did DOE—for the first time in its final rule—invoke Sections 6316(a) and 6295 as the exclusive basis for its authority to issue standards for DPPP motors. *Id.* DOE cannot "flip-flop" on a threshold issue in its final rule and then claim forfeiture to shield that decision from judicial review. *Environmental Integrity Project*, 425 F.3d at 997.

Nor would requiring exhaustion serve the finality interests DOE alludes to in its brief. (Resp't's Br. 23–24.) As the Supreme Court explained in another recent decision, "[r]egulated parties 'may *always* assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them' or 'petition an agency to reconsider a longstanding rule and then appeal the denial of that petition.'" *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 144 S. Ct. 2440, 2458–2459 (2024) (emphasis added) (citation omitted). To deem

Zodiac's statutory authority argument forfeited for purposes of this case would hardly mean the Pool Pump Motor Rule "enter[s] a promised land free from legal challenge." *Id.* at 2459 (citation omitted).

In any event, DOE cannot seriously dispute that the principal purpose of requiring exhaustion—ensuring agencies "have the opportunity to address [the issue] in the first instance"—is satisfied here. *United Refining Co.*, 64 F.4th at 456–457 (citing *Southwestern Pa. Growth All.*, 121 F.3d at 112); *see Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014) (no forfeiture when issue "was expressly addressed by EPA"). Even when exhaustion is statutorily required (and as noted, EPCA includes no such requirement), courts will not deem an issue forfeited if the agency "has in fact considered the issue" on its own. *Petroleum Commc'ns, Inc.*, 22 F.3d at 1170. There can be no question that DOE, having decided and then *sua sponte* reconsidered the question of its statutory authority, was grappling with and actively considering that issue all along. For these many reasons, the question of DOE's statutory authority to issue energy conservation standards for electric motors is properly before this Court.

## II. DOE exceeded its statutory authority in issuing the Pool Pump Motor Rule.

### A. DOE has not identified any provision in EPCA authorizing it to issue energy conservation standards for DPPP motors.

Zodiac's opening brief raised a pointed question for DOE: precisely where in EPCA did Congress authorize it to prescribe energy conservation standards for DPPP motors?  DOE responds by citing the same four statutory provisions it invoked in the Pool Pump Motor Rule—Sections 6316(a), 6295(o) and (p), and 6311(1)(A). (Resp't's Br. 26 & 29 n.3.)  But as Zodiac has already explained, these provisions merely define the term "covered equipment" to include electric motors and establish criteria and procedures for DOE to follow when issuing *otherwise authorized* standards for covered equipment.  (Pet'r's Br. 30–34.)  Not one contains language authorizing DOE to prescribe new energy conservation standards in the first instance.

DOE's theory appears to be that, by including "electric motors" as "covered equipment" in Part A-1 of EPCA, Congress implicitly vested DOE with authority "to regulate the energy efficiency of" electric motors however it sees fit.  (Resp't's Br. 25.)  That suggestion flouts settled principles of statutory construction—and EPCA's plain language.  To be sure, Congress often will "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme,' or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such

-8-

as 'appropriate' or 'reasonable.'" *Loper Bright*, 144 S. Ct. at 2263 (citations omitted). Part A of EPCA includes what could be construed as such language for "covered products." 42 U.S.C. §6295(a)(2) (identifying one purpose of Section 6295 as "to…authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product"). But Part A-1 contains no similar language for "covered equipment," *see id.* §§6312–6313, and when Congress incorporated portions of Section 6295 into Part A-1, it notably did not include Section 6295(a), *see id.* §6316(a).[6]

Nor does Part A-1 include any specific language of authorization for DPPP motors. Other provisions in EPCA confirm that Congress knew how to—and did— grant such authority where it wanted to. For multiple categories of covered equipment, Congress established statutory energy conservation standards for a subset of equipment within the category and expressly granted DOE residual authority to issue standards for the remainder. *See id.* §6313(c)(5)(B) (providing

---

[6] DOE's attempted comparison of the Pool Pump Motor Rule to a February 2024 rule establishing energy conservation standards for kitchen ranges and ovens fails for this (and other) reasons. (Resp't's Br. 31–32.) Kitchen ranges and ovens are "covered products" under Part A, *id.* §6292(a)(10), and arguably subject to the broad grant of authority under Section 6295(a)(2), *id.* §6295(a)(2). The referenced rule also is a direct final rule adopting standards proposed by regulated parties under Section 6295(p)(4), so it is unsurprising no one challenged them. *See* 89 Fed. Reg. 11,434, 11,435–11,436 (Feb. 14, 2024). In any event, even if the two rulemakings were on all fours, the fact that DOE got away with issuing one unlawful rule does not immunize it to do so in perpetuity. DOE, of course, cites nothing to support that suggestion. (Resp't's Br. 30–32.)

"[t]he Secretary may issue, by rule, standard levels for other types of commercial refrigerators, freezers, and refrigerator-freezers" for which Congress had not established standards in preceding subsection); *id.* §6313(d)(2)(A) (same for automatic commercial ice makers). Elsewhere, Congress expressly directed DOE to establish energy conservation standards for specific types of covered equipment. *See id.* §§6313(f)(4), 6313(g), 6317.

Such an express grant of authority is conspicuously absent for DPPP motors—a point Zodiac made in its opening brief. (Pet'r's Br. 31–32.) DOE bypasses the issue, ostensibly recognizing that it is impossible to reconcile these targeted grants of authority with DOE's theory that EPCA grants it sweeping regulatory authority for *all* types of covered equipment. *See Louisiana v. U.S. DOE*, 90 F.4th 461, 471 (5th Cir. 2024) (limited grant of authority under EPCA to regulate "water use" for specific covered products demonstrates Congress did not intend to "g[i]ve DOE power to regulate water use by *other* products"); *Corley v. United States*, 556 U.S. 303, 314 (2009) (identifying as "one of the most basic interpretive canons" that "a statute should be construed so that effect is given to all its provision, so that no part will be inoperative or superfluous, void or insignificant" (citation omitted)).

Most problematic of all for DOE, however, is that Congress was not merely silent about what it intended for definite purpose motors; it was explicit. When Congress established energy conservation standards for "electric motors" in Section

6313(b), it expressly carved "definite purpose motors, special purpose motors," and other motors exempted by the Secretary out from the statutory requirements. 42 U.S.C. §6313(b)(1). And even though it had done so for other types of equipment, *cf. id.* §§6313(c)(5)(B), 6313(d)(2)(A), Congress did not give residual authority over the exempted motors to DOE. Whatever Congress may have intended for electric motors as a category more broadly, the statute could not be clearer: Congress did not intend for DOE to prescribe energy conservation standards for definite purpose motors such as DPPP motors.

Recognizing it cannot argue with EPCA's plain language, DOE resorts to prognosticating about legislative intent. DOE contends, for example, that Zodiac's construction of EPCA is objectionable because it would mean Congress granted DOE greater authority to regulate agency-designated covered equipment under the statute's catchall provision, Section 6295(*l*), than it did for the categories of covered equipment designated by Congress. (Resp't's Br. 27–28.) Those legislative choices are hardly inconsonant: Congress had already said its piece for the statutorily designated categories of equipment by enacting comprehensive energy conservation standards for each, and through the catchall, left it to DOE to develop standards for equipment outside of that core, congressionally controlled set.[7] But even if the Court

---

[7] That Congress understood it had retained control over standards for electric motors is further evidenced by its enactment of the Energy Independence and Security Act of 2007, Pub. L. No. 110-140, §313(b), 121 Stat. 1492, 1568–1569, 15 years after it

*were* to think this decision peculiar, it is "beyond [a court's] province"—and certainly beyond DOE's—to rewrite an otherwise unambiguous statute "and provide for what [it] might think…is the preferred result." *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2000) (third alteration in original).

All of this makes clear that DOE does not have the broad authority it would like to have to issue energy conservation standards for DPPP motors. To the contrary, EPCA authorizes DOE to do just two things: issue new standards where Congress authorized it to do so, *see* 42 U.S.C. §§6313(c)(5)(B), 6313(d)(2)(A), 6313(f)(4), 6313(g), 6317; and amend existing standards once established, whether by Congress or DOE, *id.* §6295(m), §6316(a). DOE concedes Congress has not authorized it to issue energy conservation standards for DPPP motors in Section 6313—the only provision in Part A-1 that speaks directly to such standards—and it has failed to identify any other provision in EPCA granting it that authority. The Pool Pump Motor Rule therefore must be vacated as having been issued in clear excess of agency authority.

---

first established statutory energy conservation standards for certain electric motors, in which it updated existing statutory standards and established new ones for other types of motors.

**B.    The Court should accord no deference to DOE's evolving interpretation of EPCA.**

The Court in *Loper Bright* explained that while *Chevron* deference cannot be squared with the Administrative Procedure Act ("APA"), *Skidmore*[8] deference—because it is nonbinding—can.  144 S. Ct. at 2259.  Under *Skidmore*, courts may look "for guidance" to agency interpretations, even if they cannot mechanically defer to them.  *Id.* at 2262 (quoting *Skidmore*, 323 U.S. at 140).  Such interpretations are most useful when they are issued contemporaneously with the statute and "have remained consistent over time" or when they "rest[] on factual premises within [the agency's] expertise."  *Id.* at 2262, 2267 (second alteration in original).

DOE's reading of EPCA meets none of these criteria.  DOE did not first assert authority over DPPP motors until August 2017—nearly 40 years after Congress retooled EPCA to apply to certain "[e]lectric motors and pumps."  Nor has its position remained consistent over time.  *Cf. Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 304 (3d Cir. 2012) ("Less deference is afforded [under *Skidmore*] when an agency's interpretation is inconsistent with its prior positions.").  DOE has wavered, first citing Section 6313(b) as providing its authority over DPPP motors, then reversing itself and shifting to Sections 6316(a) and 6295 in the 2023 final rule.  *Compare* 87 Fed. Reg. at 37,128, *with* 88 Fed. Reg. at 66,971.

---

[8] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

Finally, Zodiac's challenge to DOE's statutory authority in no way implicates underlying factual issues or the agency's substantive expertise. *Cf. Loper Bright*, 144 S. Ct. at 2267. Rather, the case before the Court raises a pure question of law "about the scope of [DOE's] own power." *Id.* at 2266. As Chief Justice Roberts put it, this is "perhaps the occasion on which abdication in favor of the agency is *least appropriate*." *Id.* DOE has vacillated on the source of its authority to issue the Pool Pump Motor Rule, claims authority which has no basis in the statute, and now, when confronted with the reality that EPCA does not authorize its rule, attempts to use its own uncertainty against Zodiac to prevent this Court from even addressing the question. DOE's interpretation is due no deference from this Court.

## III.    The variable-speed-control mandate for PCBP motors is arbitrary and capricious.

### A.    DOE erred in applying Section 6295(q) to the variable-speed-control design requirement.

DOE contends that its refusal to create a separate equipment class for PCBP motors was reasonable. Again leaning on nothing but its own say-so, DOE claims Section 6295(q) controls in determining whether to "divid[e] … regulated items into 'equipment classes' subject to different regulatory requirements." (Resp't's Br. 32.) DOE argues that it appropriately considered the factors in Section 6295(q) in deciding to divide DPPP motors into equipment classes based solely on total motor horsepower. For several reasons, DOE is wrong.

-14-

First, DOE does not explain why Section 6295(q) provides the relevant standard for determining equipment classes that should be subject to a design requirement. Section 6295(q) supplies the framework for determining whether "an energy conservation standard for a type (or class) of covered products" should include a special rule that "specif[ies] a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products." 42 U.S.C. §6295(q)(1). EPCA makes clear that for purposes of this provision, the level of "energy use," *id.* §6311(4), and "energy efficiency," *id.* §6311(3), "are determined in accordance with test procedures established under section 6314 of this title," *id.* §6311(3), (4). The variable-speed-control mandate is a "design requirement"—it does not determine the level of energy use or energy efficiency of any covered product under DOE's test procedures.[9]

DOE acknowledged as much in establishing the test procedures for PCBPs and PCBP motors, both of which can be successfully tested without using variable-speed technology. *Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pumps*, 82 Fed. Reg. 36,858, 36,885 (Aug. 7, 2017); 86 Fed. Reg. at 40,770. Indeed, DOE specifically recognized in an earlier rulemaking proceeding

---

[9] *See id.* §6295(s) ("Compliance with, and performance under, the energy conservation standards (*except for design standards authorized by this part*) established in, or prescribed under, this section shall be determined using the test procedures and corresponding compliance criteria prescribed under section 6293 of this title." (emphasis added)).

that a PCBP can be tested with a single-speed motor and satisfy the applicable minimum weighted energy factor ("WEF") score, too. 82 Fed. Reg. at 36,885. As the WEF score is the only energy conservation standard specifying a level of energy efficiency or energy use for the covered equipment at issue, and PCBPs already are treated as a separate equipment class for purposes of that standard, DOE's reliance on Section 6295(q) in analyzing the equipment classes that should be subject to the variable-speed-control design requirement is nonsensical.

## B.    Even if Section 6295(q) applies, DOE erred in refusing to create a separate equipment class for PCBP motors.

Assuming *arguendo* Section 6295(q) did provide the controlling framework, DOE clearly erred in applying it here. For starters, DOE stated in the final rule that it "generally does not consider end-use applications (for DPPP motors, end-use would be DPPPs) when analyzing equipment classes for covered equipment." 88 Fed. Reg. at 66,976. DOE cites no authority for that proposition, which conflicts with the plain language of Section 6295(q)(1). 42 U.S.C. §6295(q)(1) (stating an energy conservation standard can contain a special rule for a "group of covered products … hav[ing] the same function or intended use").[10] DOE does not attempt to defend that assertion in its brief—and rightfully so. Function and intended use

---

[10] *See also* 42 U.S.C. §6291(9) (defining "class of covered products" as "a group of covered products, the functions or intended uses of which are similar (as determined by the Secretary)").

-16-

are placed on equal footing in Section 6295(q)(1), and nothing in EPCA authorizes DOE to establish a general policy disfavoring one of these criteria.

DOE's misapplication of Section 6295(q)(1) is especially egregious in the context of DPPP motors. DOE agrees DPPP motors are "definite purpose motors," *id.* §6311(13)(C), and so are covered by the exception from the energy conservation standards for electric motors in Section 6313(b)(1). "[U]se on a particular type of application" is one of the criteria Congress emphasized in creating that exception. *Id.* §§6311(13)(C), 6313(b)(1). Once again, DOE's position runs headlong into, and cannot be reconciled with, EPCA's plain language.

What's more, DOE fails to acknowledge that both criteria point in the same direction in this case. The function and intended use of a DPPP motor is to provide electrical power for a DPPP; DPPPs are covered equipment that is already divided into separate equipment classes under DOE's energy conservation standards; one of those equipment classes is PCBPs; and the motor is a component of the pump. 88 Fed. Reg. at 66,978 ("DOE has the authority to regulate both a component (DPPPM) and the end-product (DPPPs)."). This obviously is not a scenario where DOE is analyzing covered equipment under Section 6295(q) against a clean slate. Nor is DOE analyzing covered equipment whose function or intended use is beyond the reach of EPCA. The motor and pump operate together as part of an integrated

system.  DOE went out of its way to ignore that simple principle in conducting its Section 6295(q) analysis.[11]

If DOE had faithfully applied the criteria in Section 6295(q), the justification for creating a separate equipment class for PCBP motors becomes self-evident.  The function or intended use of a PCBP motor is to provide electrical power for a PCBP, and a PCBP is designed to operate as a "[s]ingle-speed dedicated-purpose pool pump," *i.e.*, "a dedicated-purpose pool pump that is capable of operating at only one speed."  10 C.F.R. §431.462.  That is the performance-related feature which clearly distinguishes PCBPs from other DPPP systems subject to the final rule, each of which are designed to perform multiple functions at different operating speeds.[12] And it is that same performance-related feature which distinguishes PCBP motors from other DPPP motors in analyzing the utility of variable-speed-control technology under Section 6295(q).[13]

---

[11] A design standard for a DPPP motor is also a design standard for a DPPP, a fact DOE recognized in its technical support document.  (JA000520 ("[M]otor selection is a critical aspect of DPPP design and repair."))

[12] *See id.* (defining "Two-speed dedicated-purpose pool pump" and "Variable-speed dedicated-purpose pool pump").

[13] And even if DOE were correct that PCBP motors lack features distinguishing them from other applications (and it is not), its argument still fails.  That reasoning would be equally applicable to, for example, electric spa pump motors—which DOE *did* disaggregate and exempt in the final rule, negating its own argument.  88 Fed. Reg. at 66,978.

### C. DOE does not have a reasonable basis for requiring variable-speed-control motors in PCBPs.

DOE concedes in its brief that a PCBP motor will only ever operate at a single speed. DOE nevertheless contends that a variable-speed-control motor is needed to improve the energy efficiency of that single-speed system. But not because the motor will ever operate at more than one speed as with the other DPPP systems subject to the final rule. Rather, DOE says that a variable-speed-control motor is necessary to allow a PCBP system to operate at some—in DOE's own words "almost impossible to identify"—post-installation, "optimal" speed that will "significantly reduce the amount of energy consumed by the pump." (Resp't's Br. 40, 41.)

DOE's lone support for that claim is a self-described "scientific study"[14] submitted by a group of commenters referred to as the California Investor-Owned Utilities ("2016 Study"). That study, according to a summary in a May 2016 PowerPoint presentation, analyzed the performance of a variable-speed motor when installed in two single-stage PCBP systems at a single pool. The results purported to show that installing variable-speed motors produced energy savings by allowing

---

[14] DOE did not characterize the 2016 Study as "scientific" in the final rule—and for good reason. There is no indication the study meets the scientific integrity standards that warrant use of that label. *See* 74 Fed. Reg. 10,671, 10671 (Mar. 9, 2009) ("When scientific or technological information is considered in policy decisions, the information should be subject to well-established scientific processes, including peer review where appropriate, and each agency should appropriately and accurately reflect that information in complying with and applying relevant statutory standards.").

the systems to operate at a lower speed.  DOE's discussion of the 2016 Study is, to put it mildly, less than complete.

Initially, DOE fails to mention that in a December 2022 notice of proposed rulemaking, published shortly after the proposed rule in this proceeding, DOE characterized that same study as "not present[ing] significant information that was not already considered by the DPPP Working Group, other than a measurement from a single instrumented pool," in developing the original test procedure for PCBPs. *Energy Conservation Program: Test Procedure for Dedicated-Purpose Pool Pumps*, 87 Fed. Reg. 74,023, 74,036 (Dec. 2, 2022).  Having already said the information in the 2016 Study did not provide a sufficient basis for changing the former—which is the only method that can be used to determine energy use and energy efficiency of a PCBP under EPCA, 42 U.S.C. §6295(s)—DOE was required to explain why that same information suddenly justified imposing a design requirement on every PCBP motor in the country.  *Comite' de Apoyo a Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 187 (3d Cir. 2014) (agencies must provide "reasoned explanation" for "change in course" (collecting cases)).  DOE's decision to stay silent on this point, both in the final rule and in its brief, is yet another example of its willingness to speak out of both sides of its mouth in this proceeding.  *Bittner v. United States*, 598 U.S. 85, 97 n.5 (2023).

-20-

Equally troubling, DOE said nothing in the proposed rule or technical support document about its intent to rely on the 2016 Study in developing energy conservation standards for PCBP motors.  Because DOE had already considered (and dismissed) that study in developing energy conservation standards for PCBPs in the 2017 Pool Pump Rule, Zodiac and other interested stakeholders had no reason to believe DOE would rely on it in developing a final rule for PCBP motors more than seven years later, let alone that it would provide the primary justification for the variable-speed-control design requirement.  And as Zodiac noted in its opening brief, DOE deviated from its standard procedures in initiating this proceeding. (Pet'r's Br. 19 n.11 (citing 87 Fed. Reg. at 37,130 (citing 10 C.F.R. pt. 430, subpart C, app. A)).)  Had DOE followed those procedures and relied on the 2016 Study in the preliminary phase of the standard development process—or done so in a subsequent proposed rule or technical support document—Zodiac and other interested stakeholders could have commented on that decision before DOE issued the final rule.  Bypassing the standard procedures denied regulated parties that opportunity.

Regarding the information DOE *did* include in the proposed rule and technical support document, Zodiac and other interested stakeholders repeatedly told DOE the proposed variable-speed-control mandate for PCBP motors required further study

-21-

and analysis.[15]  Commenters specifically questioned the assumption that a variable-speed motor could run at a lower speed in a PCBP and asked DOE to validate that assumption with additional testing.  (JA000398–000399, JA000410.)  Commenters also questioned whether any energy savings would be produced even if a PCBP with a variable-speed motor could run at a lower speed.  Zodiac conducted a comparative field study during the comment period to corroborate these concerns, the results of which cast further doubt on DOE's assumptions.  (JA000432–000440.)  How did DOE respond?  By developing a final rule that relied on a single, seven-year-old study of two PCBP systems—a study it had only recently written off in a related proceeding for its limited utility—to justify the installation of variable-speed-control motors in every PCBP system in the country.

The strained analysis within the final rule itself confirms the arbitrary nature of DOE's reliance on the 2016 Study.  DOE dismissed Zodiac's field study, which examined "two typical residential in-ground pool installations … with a multi-stage and a single-stage booster pump fitted with the most compatible variable-speed DPPP motor currently available," for not being "representative of the entire market" and failing to "reflect the entire range" of potential costs, energy usage, and other

---

[15] As Zodiac noted in its initial brief, DOE denied a request from Zodiac and other interested stakeholders to extend the comment period by an additional 30-day period. (JA000367–000369.)

conditions.[16]  88 Fed. Reg. at 67,003.  Yet DOE turned a blind eye to these same concerns—concerns DOE itself had previously registered—in analyzing the 2016 Study.  *See Walter O. Boswell Mem. Hosp. v. Heckler*, 749 F.2d 788, 803 (D.C. Cir. 1984) ("reliance on a single study criticized extensively by its authors in its particular application can obviously be an arbitrary and capricious action"); *Ergon-W. Va., Inc. v. United States*, 896 F.3d 600, 610 (4th Cir. 2018) ("reliance on a facially-flawed report is arbitrary and capricious").  DOE did not even address whether the variable-speed motors or PCBPs considered in that study remain on the market—presumably because it had no interest in the answer—despite the fact that Zodiac and other stakeholders noted that significant changes in PCBP technology have occurred in recent years. (JA000433.)  Indeed, Zodiac specifically noted that multi-stage booster pumps, which are more energy efficient than the single-stage booster pumps considered in the 2016 Study, accounted for 47% of the PCBP market in 2022. (JA000920.)  Failing to address nearly half of the current products on the market hardly makes a study "representative," a fact even DOE recognized in evaluating the 2016 Study only a few months before issuing the final rule.

---

[16] DOE's criticism of Zodiac's failure to consider "the entire range of possible installation" scenarios in conducting its comparative field study has not aged well. DOE's principal contention before this Court is that variable-speed motors must be installed in single-speed PCBPs for that very reason.

Finally, the 2016 Study says nothing about whether an ordinary consumer who purchases a PCBP system with a variable-speed-control motor will be able to achieve comparable reductions in operating speed. DOE admits as much in its brief, conceding the "optimal" speed of a variable-speed PCBP motor is "almost impossible to identify" before installation, and that "[i]t may be true that operating the pump at maximum speed is necessary in some installations where a lot of pressure is lost in the connection between the pool cleaner and the booster pump." (Resp't's Br. 40–41, 43.) In other words, DOE acknowledges that variable-speed-control motors will serve no useful purpose in at least some PCBP systems. DOE also admits it cannot say to what extent they will be useful in any other PCBP system. Yet somehow, despite all of this, DOE claims that mandating use of variable-speed-control motors in all PCBP systems will be cost-effective based on a seven-year-old study of just two systems in a single instrumented pool with a fixed piping configuration, the results of which are presented only in a 15-page PowerPoint summary, and the utility of which DOE itself had questioned just one year prior. That sounds unreasonable because it is.

### D.    DOE's remaining arguments are unpersuasive.

As for DOE's remaining arguments, the suggestion that an exception from the variable-speed-control mandate cannot be provided for PCBP motors because they only account for 4% of the relevant market starts with a false premise; namely, that

DOE should be requiring variable-speed-control motors on PCBPs in the first place. PCBPs are specifically designed for single-speed motors and can satisfy the energy conservation standards in the 2017 Pool Pump Rule without using variable-speed-control technology. The record demonstrates that manufacturers are also more than willing to continue supplying single-speed motors for PCBPs. They are only incurring costs and shifting away from single-speed motors because of the variable-speed-control mandate. (JA000701.) DOE's position finds no support in logic, either. Exceptions are most warranted when the market impact is small. No one wants federal agencies to be in the business of only granting exceptions that swallow the rule.

Finally, DOE's desire to "harmonize" federal and state regulatory standards is not itself a legitimate justification for the rule. (Resp't's Br. 33–34.) It is abundantly clear from EPCA's system of preemption and waivers that Congress intended to establish uniform federal standards—not to simply defer to the states.

## IV.    The Pool Pump Motor Rule must be vacated.

DOE offers no meaningful response to Zodiac's arguments as to remedy. DOE ignores Zodiac's threshold point that remand without vacatur is appropriate— if ever—only when the underlying defect is capable of cure by the agency, and a lack of statutory authority is not something DOE can cure. (Pet'r's Br. 54–55); *Bridgeport Hosp. v. Becerra*, No. 22-5249, 2024 WL 3504407, *7 (D.C. Cir. July

23, 2024) ("Because an agency can't 'cure' the fact that it lacks authority to take a certain action, remand-without-vacatur is unavailable here."). DOE also ignores Zodiac's arguments regarding financial and other impacts to manufacturers should they be required to comply with an unlawful final rule. (Pet'r's Br. 56.) By failing to respond, DOE has waived any objection to vacatur should the Court agree with Zodiac on the merits. *See Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005).[17]

With respect to Zodiac's alternative argument—that the rule must be vacated at minimum as applied to PCBPs (Pet'r's Br. 56)—DOE claims summarily that vacatur is "wildly disproportionate to the[] asserted problems." (Resp't's Br. 51.) Not only is that argument unsubstantiated, it also is irreconcilable with DOE's insistence throughout its brief that PCBPs make up such a small portion of the

---

[17] In a footnote, DOE directs the Court to briefing it has filed in separate litigation questioning the propriety of nationwide vacatur under the APA. (Resp't's Br. 50 n.8.) Initially, this Court has denounced the practice of argument "by reference to what [a party] said somewhere else," which "would effectively nullify the page or word limits imposed by the appellate and local rules." *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 815–816 & nn.9–10 (3d Cir. 2016) (collecting cases). DOE has therefore forfeited any argument regarding the scope of available relief under the APA. *Id.* But the argument would fail even if the Court were to entertain it. Whatever merit DOE's contentions may have *vis-à-vis* post-enforcement challenges, they do not fit the context of direct judicial review. In an enforcement proceeding, the agency action under review is an order applicable only to the parties before the court. This case—involving a pre-enforcement, facial challenge to a final rule on direct review—is fundamentally different. If the final rule itself is unlawful, as Zodiac submits, that necessarily has the effect of invalidating the rule in all applications.

market that DOE did not need to create an exception for them. (*Id.* at 21, 35, 39.) For these reasons and those set forth in Zodiac's opening brief, vacatur, at minimum with respect to PCBPs, is the only appropriate remedy in this case.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Pool Pump Motor Rule under Section 706 of the APA.

Respectfully submitted,

*/s/ Keith J. Coyle*
Keith J. Coyle, Esquire
D.C. Bar ID No. 61558
Christina Manfredi McKinley, Esquire
P.A. Bar ID No. 320002
Stefanie Pitcavage Mekilo, Esquire
P.A. Bar ID No. 312720
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com
smekilo@babstcalland.com
*Counsel for Petitioner*
*Zodiac Pool Systems LLC*

Dated: August 7, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, as determined by the word-count function of Microsoft Word and excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,472 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3.      All counsel of record are members in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

4.      The electronic version of this Reply Brief is identical to the paper copies of the brief to be filed with the Court.

5.      A virus detection program, Windows Security Virus & Threat Prevention, version 1.407.732.0, was run on the electronic version of the brief and no viruses were detected.

*/s/ Keith J. Coyle*
Keith J. Coyle, Esquire
*Counsel for Petitioner*

Dated: August 7, 2024

## **CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25(d) and Local Appellate Rule 31.1(d), I hereby certify that the foregoing "Reply Brief of Petitioner Zodiac Pool Systems LLC," was electronically filed through this Court's CM/ECF system, which will send a notice of filing to the counsel registered to receive service through the Court's CM/ECF system via electronic filing.

*/s/ Keith J. Coyle*
Keith J. Coyle, Esquire
*Counsel for Petitioner*

Dated: August 7, 2024